Steve RODGERS, Plaintiff-Appellant,

v.

LINCOLN TOWING SERVICE, INC., et al., Defendants-Appellees.

No. 84–2823.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1985.

Decided Aug. 15, 1985.

William J. Harte, William J. Harte, Ltd., Chicago, Ill., for plaintiff-appellant.

Sharon Baldwin, Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, FLAUM, Circuit Judge, and TIMBERS, Senior Circuit Judge.*

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

CUMMINGS, Chief Judge.

Plaintiff Steve Rodgers filed the instant suit alleging numerous violations of his civil rights by the various defendants on October 6, 1983. Plaintiff filed an amended complaint on December 1, 1983,[1] but on March 29, 1984, the district court granted a motion to dismiss for failure to state a claim filed by several of the defendants under Fed.R.Civ.P. 12(b)(6). 596 F.Supp. 13 (N.D.Ill.1984). The trial court also assessed one-third of the defendant's attorney's fees and costs as sanctions against Rodgers' lawyers under Fed.R.Civ.P. 11. *Id.* at 22. After the district court denied Rodgers' motion for reconsideration, *id.* at 26, he filed the instant timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

For purposes of considering the dismissal of plaintiff's complaint under Rule 12(b)(6), we take the factual allegations of plaintiff's complaint as true. On the evening of October 7, 1982, Rodgers parked his car in the parking lot of Belden Corned Beef Center, on the north side of Chicago, Illinois. When he left the restaurant about an hour later, he found that his car had been towed by Lincoln Towing Service, Inc. ("Lincoln Towing"), a towing operation employed by restaurants and other establishments to remove illegally parked cars from their parking lots. Rodgers retrieved his car that evening, but only after paying a towing fee.

That evening, some unknown person threw paint on the side of Lincoln Towing's building. At about 1:00 a.m. on October 8, Rodgers received an anonymous phone call claiming to be from the police and informing him the police would be "coming to your house for throwing paint on the build-

ing." One week later, on October 15, Detective Philip Pagano of the Chicago Police Department telephoned Rodgers concerning the paint-throwing incident, told him he had been identified as the one who had thrown the paint, and requested him to come to the police station to "answer charges." Pagano told Rodgers to bring $100 with which to post bail in case a complaint was filed, and that if he did not come to the police station a warrant would be issued for his arrest.

Rodgers went to the police station on October 18 at 5:20 p.m. There he was questioned for approximately an hour by Pagano, Chicago Police Detective William McGarry, and two employees of Lincoln Towing, Steven Mash and Steven Eisgrau. Neither during this interview nor earlier during the phone call was Rodgers informed of any of his constitutional rights. Rodgers steadfastly maintained his innocence of the accusations.

While he was being questioned, Rodgers saw Mash and Eisgrau, who are personal friends of Pagano's, insisting that Pagano write up a complaint against Rodgers. Pagano did so, and Mash signed the complaint, at which time Rodgers was formally arrested. He was jailed for over ten hours,[2] until 5:00 a.m. the next morning, before being allowed to post bail, despite his informing Pagano and other police officers that he had sufficient funds to make bail. Rodgers was never informed of his constitutional rights, nor was he allowed to phone his attorney. Rodgers was acquitted of the charge in subsequent proceedings in state court.

Rodgers alleges in addition, in various memoranda of law he has filed in this case but not in his complaint, that he went to the police station on October 18 pursuant to an interview arranged with Pagano dur-

---

1. All references to Rodgers' complaint are to this amended complaint.

2. Rodgers claims to have been jailed for twelve hours, but if he arrived at the station house at 5:20 p.m., and was questioned for about an hour before being arrested, he would not have been jailed before approximately 6:30 p.m. He then

would have been incarcerated roughly ten and a half hours before being released at 5:00 a.m. the following morning. Our analysis would not be changed whether Rodgers was jailed ten and a half, or twelve, hours, but we adhere to the former characterization for the sake of accuracy.

ing his phone call three days earlier and that while there he was threatened that if he did not confess to the charge, or pay restitution to Lincoln Towing for the damage caused by the paint, he would be jailed. Rodgers also claims that in a private meeting between Mash, Eisgrau, and Pagano, one or more of them said they would arrest Rodgers "to teach the punk a lesson." Lincoln Towing, Rodgers claims, wanted to make an example of him to all whose cars might be towed by Lincoln Towing. Rodgers also alleges, without factual support, that Mash, Eisgrau, and Pagano all knew the charges against Rodgers were false.

## II

 We stress that in evaluating the court below's dismissal of the complaint for failure to state a claim, we can consider only the factual allegations of the complaint. See, e.g., Sutliff, Inc. v. Donovan Cos., 727 F.2d 648, 654–655 (7th Cir.1984). Even the liberal notice pleading allowed by the federal rules requires the complaint to include the operative facts upon which a plaintiff bases his claim. Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80; Strauss v. City of Chicago, 760 F.2d 765, 767–768 (7th Cir.1985). Consequently Rodgers' allegations that lie outside the complaint—most of which are conclusory and not factual anyway—are irrelevant to our analysis. Even if Rodgers' complaint included these allegations, our determination that dismissal of the complaint was proper would not change.

Pagano frames several allegations under 42 U.S.C. § 1983.[3] The most substantive of these involves his detention overnight without the opportunity to post bond. Rodgers asserts in passing that this detention was a violation of his substantive right to liberty, not a procedural due process violation. Br. at 11. He does not develop this contention, and in fact it is in error.

Guenther v. Holmgreen, 738 F.2d 879 (7th Cir.1984), involved a fact pattern almost identical to the case at bar. There we distinguished between holding the plaintiff overnight (for about nine hours) despite the spouse's ability to post bail, which we found implicated only the plaintiff's procedural due process liberty rights, from arresting the plaintiff initially without probable cause, which would have implicated a substantive constitutional right to be free from unreasonable searches and seizures. Id. at 882. Guenther was in fact a more egregious situation. There instead of negligently failing to complete administrative procedures in a timely manner, the police actually had refused the plaintiff's spouse's offer to post bail. Only when the plaintiff was transferred to another jail was the bail offer accepted.

 In the case at bar, Pagano had adequate probable cause to arrest Rodgers, see infra pp. 200–201, and Rodgers received the first appearance before a magistrate that the Fourth Amendment requires. See Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 ("the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest"); Coleman v. Frantz, 754 F.2d 719 (7th Cir.1985) (eighteen-day detention before first appearance unconstitutional). His complaint is that it took the police ten and a half hours to complete the paperwork necessary to book and formally charge him with the vandalism of Lincoln Towing, and that amount of time is too long. Rodgers has informed us that the Illinois Supreme Court rules recommend that booking procedures take only one hour. Even so, Rodgers has not indicated that the delay was caused by anything but negligence. He has alleged no facts that would suggest that the delay was intentionally or mali-

---

**3.** Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * *, subjects, or causes to be subjected, any * * * person within the jurisdiction [of the United States] to the depriva-

tion of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * *

ciously caused, and ten hours is not so long that it "shocks the conscience" of the court, *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). When only random, negligent actions by state officials deprive an individual of procedural due process rights, the availability of adequate state tort remedies to redress the wrong meets constitutional requirements of due process. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Guenther v. Holmgreen*, 738 F.2d at 882; *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1147 (7th Cir.1983); *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 871 (7th Cir.1983). Rodgers' access to state tort claims for false imprisonment and malicious prosecution precludes him from using Section 1983 to compensate him for his injuries.

■ Rodgers next argues that the police's failure to advise him of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), violated his constitutional right against compelled self-incrimination. This argument is without foundation. First, the Fifth Amendment and *Miranda* apply only to custodial interrogation, and whether Rodgers was even in custody (at least until his arrest, after which he was not questioned) is arguable. See *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (suspect not in custody during interview at station house, notwithstanding the fact that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it"). But even if the questioning were custodial, Rodgers never incriminated himself. Consequently, his right to be free from compelled self-incrimination was never infringed.

■ Nor can Rodgers' Sixth Amendment claim that he was deprived of his right to counsel stand. The right to counsel does not attach until "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illi-*

*nois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Rodgers interprets *Kirby* to mean that Mash's signing of the citizen's complaint—if not the questioning at the station house—constituted the initiation of such adversary proceedings. This interpretation is a gross overextension of *Kirby* and similar cases. Rodgers had been identified as a suspect prior to being requested to meet with Pagano at the station house, so that no identification procedures were abused. Equally important, no critical stage of the prosecution was implicated in the ten and a half hours that Rodgers awaited formal booking. Simply nothing happened during that time for which Rodgers would need counsel. Notably the major Supreme Court cases on the issue all involve stages of a criminal investigation occurring after formal booking. See, *e.g., Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424; *Kirby, supra*. Quite consistent with this precedent is the determination that Rodgers' Sixth Amendment right to counsel did not attach until he was formally charged at 5:00 a.m. on October 19, at which time he posted bail and left. See *Guenther v. Holmgreen*, 738 F.2d at 882 n. 1 (appellant did not appeal district court's "manifestly correct" holding that right to counsel did not attach until formal booking and that it was not implicated when appellant was held overnight without opportunity to post bail). Without the right to have counsel present, Rodgers had "no Sixth Amendment right to place a phone call, be it to an attorney or family members." *State Bank of St. Charles v. Camic*, 712 F.2d at 1145 n. 2.

■ Rodgers states two claims under the Fourth Amendment, which if true would "violate[ ] his substantive Fourth Amendment right to be free from unreasonable searches and seizures." *Guenther v. Holmgreen*, 738 F.2d at 882. An examination of the facts he alleges illustrates that his allegations cannot stand. First, he equates Pagano's phone call requesting him to come to the station house to "answer charges" with a seizure under the Fourth Amendment. The test in this Cir-

cuit for determining whether a seizure has occurred is what a reasonable person would believe. *United States v. Borys*, 766 F.2d 304, 308 (7th Cir.1985); *United States v. Black*, 675 F.2d 129, 133–134 (7th Cir.1982), certiorari denied, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). Yet the Supreme Court has long recognized that not all police questioning of individuals constitutes a seizure. See, *e.g.*, *United States v. Royer*, 460 U.S. 491, 497–498, 103 S.Ct. 1319, 1323–1324, 75 L.Ed.2d 229 (1983); *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889. We do not believe that a telephone call to an identified suspect from a detective investigating a charge of vandalism constitutes such a restraint on the suspect's freedom that his coming to the station house is anything other than a voluntary action. That Pagano told Rodgers he would secure an arrest warrant if Rodgers refused does not alter the outcome; Rodgers was free to demand that Pagano do just that. Pagano was not even confronting Rodgers physically; Rodgers could have hung up the phone. That Pagano may have been verbally abusive does not elevate the phone call, with the distancing inherent in the tenuousness of a telephone connection and the ease with which Rodgers could have hung up the phone, into a seizure for purposes of the Fourth Amendment.

■ Even if Rodgers did in fact go to the station house on Monday only because of the Friday phone call, and while there felt that he was "a virtual prisoner * * * afraid to leave before the complaint against him was written" (Pl.Br. at 16), we do not believe that a reasonable person in Rodgers' position would have felt such a strong restraint on his freedom. See *Borys*, 766 F.2d at 311. Rodgers has not alleged that the police officers threatened him physically or mentally. Given their reasonable belief in Rodgers' guilt, their informing him they would prosecute him unless he confessed or paid restitution (a "threat" they in fact fulfilled) is a permissible way to try to resolve the matter. One who was innocent, such as Rodgers himself, need only

insist that they do just that—prosecute. Although Rodgers was being questioned by four people, only two were officers, and the two policemen have not suggested they would have prevented Rodgers' leaving. If anything, Rodgers' allegation that Pagano wrote up the complaint only because Mash and Eisgrau "pressured" him to do so—an allegation that in any event lacks all factual support in the complaint—buttresses the conclusion that a reasonable person would have felt free to leave. That the primary detective in charge of the investigation may have been reluctant to charge Rodgers formally (whether because he felt the situation could be otherwise resolved or for some other reason) would have made it easier for a reasonable person to end the questioning and leave. Moreover, Rodgers' claim that Pagano threatened him with arrest three days earlier does not mesh with his claim that on October 18 Pagano was reluctant to write up a complaint. These inconsistencies fuel our belief that the encounter between Rodgers and the two detectives was voluntary, and that a reasonable person in Rodgers' position would have felt free to leave.

■ The citizen's complaint that Mash signed established sufficient probable cause for Pagano to arrest Rodgers. We stated in *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir.1984), that "[i]f policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded." No facts suggest that Pagano acted in anything other than good faith. Pagano was confronted by two Lincoln Towing employees who steadfastly maintained they had seen Rodgers throw the paint on the building, and by Rodgers, who maintained his innocence. We cannot fault Pagano for believing Mash and Eisgrau over Rodgers, even though it turned out that Mash and Eisgrau may

have been lying.[4] Apart from the conclusion that Pagano "knew" Mash and Eisgrau were lying, Rodgers has not alleged a single fact that would indicate Pagano thought Rodgers was innocent. Evidently nothing occurred that would suggest that the two employees might be lying.

Rodgers suggests that the friendship between Pagano and Mash and Eisgrau somehow indicates that Pagano knew they were lying, but we cannot cast such a sinister light on the single fact that he knew them. We do not even know how well Pagano knew the Lincoln Towing employees, because nothing in the record suggests the "friendship" was anything more than an acquaintanceship. If anything, the friendship helps explain why Pagano credited their story over that of Rodgers', especially since Rodgers had a motive to deface Lincoln Towing's building due to the company's unwarranted towing of his car. There is nothing to support Rodgers' conclusion that Pagano "knew" the complaint was false, and therefore the court below properly held that Pagano possessed sufficient probable cause to defeat Rodgers' allegation as a matter of law.

Rodgers insists that Detectives Pagano and McGarry were in conspiracy with Mash and Eisgrau to make an example of Rodgers. There is no factual support for this allegation. Rodgers' argument reduces to the contentions that Mash and Eisgrau wanted to punish Rodgers, that Pagano was a friend of the two Lincoln Towing employees, and that somehow Pagano and McGarry knew of the two employees' bad motives and had decided to aid them. But being acquainted with someone does not establish joinder in a scheme to deprive another of his constitutional rights. Without the identification of any facts at all that would indicate that the two policemen somehow knew Mash and Eisgrau, rather than Rodgers, were the ones who were lying, the complaint cannot stand. See *Grow v. Fisher*, 523 F.2d 875, 878–879 (7th Cir.1975) (complaint alleging only that private individuals acted "in concert" with state prosecutor without any supporting facts insufficient to state claim under Section 1983). Since Section 1983 requires action under color of state law, the good faith of officers Pagano and McGarry defeats Rodgers' allegation of a conspiracy under Section 1983. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142.

Rodgers alleges in addition that McGarry is liable for failing to protect Rodgers from the other defendants' alleged violations of his constitutional rights. Our disposing of the claimed predicate violations unfavorably to Rodgers defeats this allegation.

### III

 Rodgers asserts several Section 1983 claims against the defendant City of Chicago. Although a municipality cannot be held liable under Section 1983 on a *respondeat superior* basis, it can be held liable for constitutional violations caused by its official policies, including unwritten

---

**4.** Rodgers refers to the transcript of the state criminal trial that showed Rodgers could not have been the one who threw the paint because he was in sight of Lincoln Towing personnel at the precise moment that the vandalism occurred, but this fact would not have been known to Pagano and does not reflect on his credibility. Pagano's good faith is the relevant inquiry, because Mash's dishonesty as a private citizen in signing a complaint he knew was unfounded cannot confer Section 1983 liability, which requires action "under color of state law." See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Even if we credit Rodgers' allegation, omitted from his complaint, that someone, perhaps Pagano, wanted to arrest him to teach him a lesson, that does not necessarily detract from Pagano's good faith belief that Rodgers did indeed commit the vandalism with which he was charged. However inelegantly expressed, "teaching the punk[s] a lesson" is one justification for arresting, trying, and punishing criminals. Mash's insisting that Pagano write up the complaint also is not probative. Rodgers interprets Mash's insistence as pressure, but he alleges no facts to support his conclusion. Pagano may simply have preferred to resolve the situation short of an arrest and trial. Mash's signature on the complaint would have indicated to Pagano that Mash believed Rodgers was the vandal, so that his arresting Rodgers was well-justified.

customs. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690–691, 98 S.Ct. 2018, 2035–2036, 56 L.Ed.2d 611 (1978). The Supreme Court has recently reiterated that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, —— U.S. ——, ——, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Boilerplate allegations of a municipal policy, entirely lacking in any factual support that a city policy does exist, are insufficient. *Strauss v. City of Chicago*, 760 F.2d at 767–768 (citing district court opinion in *Rodgers v. Lincoln Towing Service, Inc.*, 596 F.Supp. 13, 20 (N.D.Ill.1984) with approval).

■ Rodgers has alleged that the Chicago Police Department has a policy of placing intimidating phone calls to criminal suspects, but he has introduced no evidence apart from the one phone call he received from Pagano. We are not ready to condemn the use of phone calls to clear up misdemeanor matters, for their use can be quite efficient, provided they are not abusive. Even assuming Pagano did try to intimidate Rodgers, one phone call a policy does not make.

Rodgers repeats this allegation against the City of Chicago, again without any facts apart from his one experience, to indicate that the City in fact condones such practices. Rodgers charges the unnamed defendant Police Commissioner with failure to train employees properly and for allowing a pattern of harassment and intimidation to continue, but without alleging a single fact that would indicate problems "systemic in nature," *Powe v. City of Chicago*, 664 F.2d 639, 651 (7th Cir.1981). The isolated, intentional acts of an officer such as Pagano do not establish municipal liability under Section 1983, for to do so would be tantamount to imposing liability on a *respondeat superior* basis. The municipality must itself in some way be at fault, and Rodgers has introduced no facts to suggest the intentional conduct at the municipal level or the massive neglect that would support Section 1983 liability. Consequently, the court below's dismissal of these claims was correct.

■ With the dismissal of all of the Section 1983 claims, the dismissal of the pendent state claims was comfortably within the discretion permitted the trial court by *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218.

## IV

■ Rodgers' assertion of claims under 42 U.S.C. §§ 1985(3), 1986 is even more questionable than his Section 1983 claims.[5]

---

**5.** Section 1985(3) provides:

(3) If two or more persons in any State or Territory conspire * * * for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account

of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Section 1986 provides in relevant part:

Every person who, having knowledge that any of the wrongs * * * mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be

A successful Section 1985(3) claim requires the plaintiff to establish "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). This requirement of class-based invidiously discriminatory animus has been narrowly construed, to prevent Section 1985 from being converted into a "general federal tort law." *Id.* The Supreme Court recently reiterated the importance of this requirement in refusing to extend the protection of Section 1985 to commercial and economic animus. *United Brotherhood of Carpenters and Joiners of America Local 610 v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). We recently refused to accord Section 1985(3) protection to a handicapped individual who claimed employment discrimination against him because of his handicap. *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1485–1487 (7th Cir.1985). In doing so, we noted the differences between the handicapped as a purported class, and the "classes based on race, ethnic origin, sex, religion and political loyalty that have previously been recognized as possibly supporting a Section 1985(3) claim." *Id.* at 1486.

▮ *D'Amato* presented a much closer question than the instant situation. Rodgers simply cannot maintain he is a member of a discrete and insular class against whom Pagano and McGarry decided to discriminate. In *Askew v. Bloemker*, 548 F.2d 673 (7th Cir.1976), plaintiffs contended they were members of a class consisting of those whose homes state police raided on a certain night. We rejected that contention out of hand:

> Plaintiffs' class members shared no common characteristics prior to the defendants' action. Indeed, their status as a "class" of victims depends entirely upon the defendants' actions, and it is not possible for defendants to have conspired to discriminate against a class that did not even exist until after they had acted. Thus, no "class-based discriminatory ani-

committed, shall be liable to the party injured

mus" could have motivated the defendants' actions, and the plaintiffs have not met the prerequisites to a § 1985(3) claim under *Griffin.*

*Id.* at 678. The same analysis applies here. Rodgers claims to be a member of a class consisting of those individuals who park cars on Chicago's north side that are towed without cause by Lincoln Towing and whom Lincoln Towing decides to intimidate and harass. Such a "class" is not the readily identifiable group of individuals sharing racial, or perhaps political or religious characteristics, that Section 1985(3) was meant to encompass. Consequently this claim was also properly dismissed.

▮ Section 1986 liability is derivative of Section 1985 liability, see *D'Amato*, 760 F.2d at 1485 n. 16, so that the dismissal of the Section 1985(3) claim requires dismissal of the Section 1986 claim.

## V

▮ Plaintiff insists that the federal rules permit him to amend his complaint as of right, a right that he claims Judge Kocoras wrongfully refused. This contention is in error, for two reasons. First, a party has a right to amend his pleading "once as a matter of course at any time before a responsive pleading is served," Fed.R. Civ.P. 15(a), and Rodgers has already amended his complaint once. That the amendments were "technical" ones requested by the district court judge, "to add the correct names of 'John Doe' defendants and to correct clerical errors" (Pl.Br. at 34), is of no consequence. The federal rules do not distinguish between technical and substantive amendments, and we see no reason to do so. Nor would we accept Rodgers' characterization of the replacement of the defendants' actual names for the John Doe denominations as a trivial amendment, acting as it does to give notice to the real defendants that they are being sued. Cf. *Strauss*, 760 F.2d at 770 (district court lacked jurisdiction over John Doe defendant who was never served with summons

\* \* \*.

and who had not appeared in the proceedings).[6] Second, although the motions to dismiss filed by all defendants are not "responsive pleadings," the answer filed by defendant Pagano on December 13, 1984, clearly was a responsive pleading. See *Textor v. Board of Regents of Northern Illinois University*, 711 F.2d 1387, 1391 n. 1 (7th Cir.1983) (filing of answer by one defendant in class-action suit, in which other defendants filed motions to dismiss, defeated plaintiff's right to amend her complaint as of right). Consequently, plaintiff has lost the right to amend his complaint "as a matter of course."

■■■■■ Rodgers may still amend his complaint "by leave of court * * *; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The trial court's refusal to grant permission to file a second amended complaint is reviewable only for an abuse of discretion. *Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1244 (7th Cir.1983); *Textor v. Board of Regents of Northern Illinois University*, 711 F.2d at 1391. That refusal is proper "where the proposed amendment fails to allege facts which would support a valid theory of liability, or where the party moving to amend has not shown that the proposed amendment has substantial merit." *Verhein v. South Bend Lathe, Inc.*, 598 F.2d 1061, 1063 (7th Cir.1979) (*per curiam*) (citations omitted). Under this analysis the trial court's refusal to entertain another complaint from Rodgers was entirely appropriate.

Rodgers persists in characterizing conclusory allegations as facts, and he has refused to provide either this Court or the trial court below with "the factual predicate to support the crux" of his claims. *Jafree v. Barber*, 689 F.2d 640, 643 (7th Cir.1982). His Fourth Amendment claims depend upon Pagano's bad faith in arresting him; yet he has introduced no fact that

would suggest that Pagano believed Rodgers was innocent of the allegation that he had thrown the paint on Lincoln Towing's building. Nor does anything suggest that Pagano and McGarry were in league with Mash and Eisgrau to deprive Rodgers of his constitutional rights. Regardless of Mash and Eisgrau's motives, nothing suggests that the two policemen were doing anything other than their job in identifying the vandal who had thrown the paint on Lincoln Towing's building. Furthermore, Rodgers' coming to the station house pursuant to an interview he had scheduled with Pagano three days earlier does not negate the voluntariness of his doing so. His telephone conversation with Pagano just does not rise to the concept of "seizure" explicated by the case law on the subject. Regarding Rodgers' Fourteenth Amendment due process claim, absent a detention much longer than the ten and a half hours at issue in the case at bar, the available state tort remedies provide Rodgers all of the due process protection to which he is entitled. As previously explained, no Fifth or Sixth Amendment rights were infringed, and Rodgers cannot possibly claim the protection of Section 1985(3). In view of the legal deficiency of several of Rodgers' claims, and the lack of any of the needed factual underpinning to the others, we affirm Judge Kocoras' denial of leave to amend.

## VI

■■■■■ Counsel's final arguments center on Judge Kocoras' assessment of Rule 11 sanctions. Fed.R.Civ.P. 11 provides in pertinent part:

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after rea-

---

**6.** We note in passing that despite Rodgers' claim that he used this first amendment to correct "clerical errors," the complaint still contained the references to violations of the First and Seventh Amendments that counsel now claims "were listed by error" (R.Br. at 14). These

boilerplate allegations evincing counsel's carelessness in drafting and filing this complaint only illustrate the appropriateness of the district court's assessing sanctions under Fed.R.Civ.P. 11. See *infra* pp. 204–206.

sonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law * * *. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay * * * a reasonable attorney's fee.

Rule 11 was amended in August 1983 to increase its effectiveness in deterring abuses. Most importantly, the previous requirement that the attorney against whom sanctions were imposed must have acted in bad faith was eliminated. "The new language is intended to reduce the reluctance of courts to impose sanctions * * * by emphasizing the responsibilities of the attorney and reenforcing those obligations by the imposition of sanctions." Fed.R.Civ.P. 11 advisory committee note (citation omitted). The standard used is an objective "one of reasonableness under the circumstances," *id.*, rather than a subjective one. Consequently, plaintiff's reliance on *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000 (7th Cir.1984), decided under the old Rule 11 with its bad faith requirement, is misplaced.

 The assessment of attorney's fees in this case was well founded. A large part of Rodgers' complaint had no basis in law, and a majority of his allegations are conclusory ones, not factual ones, and so cannot withstand a motion to dismiss. Moreover, counsel has refused to recognize or to grapple with the established law of the Supreme Court and of this Circuit that defeats several of the claims at issue. For example, in arguing his Fourteenth Amendment liberty claim, counsel insists that *Logan v. Zimmerman Brush Co.*, 455 U.S.

422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), rather than *Parratt v. Taylor, supra,* controls, despite clear authority in this Circuit to the contrary. See *Guenther v. Holmgreen, supra; State Bank of St. Charles v. Camic, supra; Wolf-Lillie v. Sonquist, supra.*[7] Counsel does not even attempt to construct an argument regarding why the rule of *Logan,* rather than that of *Parratt,* should apply. Instead counsel asserts baldly that *Logan* does apply, and then moves on with the argument. The Fifth and Sixth Amendment claims and the Section 1985(3) claim were far-fetched to say the least. Equally far-fetched was Rodgers' Eighth Amendment claim, which evidently has not been appealed to this Court but with which the court below dealt.

Thus the circumstances warrant the imposition of sanctions. Counsel, however, has argued that the court below should have held a hearing on the issue of sanctions prior to imposing them. On the facts of this case, we do not agree. The Advisory Committee Notes observe:

> The procedure [of imposing sanctions] obviously must comport with due process requirements. The particular format to be followed should depend on the circumstances of the situation and the severity of the sanction under consideration. In many situations the judge's participation in the proceedings provides him with full knowledge of the relevant facts and little further inquiry will be necessary.

In the case at bar, the court below imposed sanctions of only $858.43, one-third of the attorney's fees and costs incurred by defendants, thereby crediting the possible merit of some of Rodgers' claims (596 F.Supp. at 26, 28). We agree with the district court that the complaint was overblown and that a hearing would have served no useful purpose.[8] Plaintiff's counsel ar-

---

**7.** Although we decided *Guenther* after the complaint in the case at bar was filed, *State Bank of St. Charles v. Camic* and *Wolf-Lillie v. Sonquist* had been decided well before the filing of the instant complaint, and reasonable inquiry into the law would have informed counsel of as much.

**8.** We do not agree with the district court's dismissal of the case as a "relatively minor incident" (596 F.Supp. at 22), insofar as plaintiff introduced some fact that would have indicated that Pagano indeed believed Rodgers was innocent but was in league with Mash and Eisgrau to intimidate plaintiff, or some fact to

gue that they could have disclosed to the court at an *in camera* hearing all the information in their files on this case, including information protected by the attorney-client privilege, to show that their signing the amended complaint was justified. The court below, however, assessed sanctions for filing a complaint insufficient in several areas as a matter of law and in others for failing to include factual allegations that would indicate the claim might have merit. Counsel's file cannot correct the complaint's legal deficiencies. Nor could it supply necessary factual allegations, because privileged information would not be included in any complaint Rodgers might file. If the file contains unprivileged information that would rectify the factual deficiencies we have noted, plaintiff's counsel's failure to include those facts warrants the imposition of sanctions. The trial court has not based the sanctions on bad faith, which would require a hearing, see *Textor v. Board of Regents of Northern Illinois University*, 711 F.2d at 1395, but on counsel's incompetence in handling this matter by making "frivolous" and "worthless" claims "without first making a proper inquiry into the relevant law and facts" (596 F.Supp. at 28). The record fully supports the trial court's imposition of sanctions, a penalty which counsel had adequate opportunity to contest in its motion for reconsideration in the proceedings below and in its briefs and arguments to this Court. The district court's dismissal of the amended complaint for failure to state a claim and its imposition of sanctions for filing "a ponderous, extravagant, and overblown [amended] complaint that was largely devoid of a colorable legal basis" (*id.* at 22) are affirmed.

prove that the City maintained the policies that Rodgers alleges, then he would have stated an actionable claim that could have at least survived the motion to dismiss. Such actions

would comprise the reprehensible constitutional violations that Congress intended Section 1983 to redress.