Brian J. KAMINSKI, Plaintiff,

v.

CITY OF WHITEWATER, WI,
Timothy Gray and Edward
Parker, Defendants.

Civ. A. No. 93–C–0962.

United States District Court,
E.D. Wisconsin.

March 6, 1995.

James R. Green and Paula Tipton Wallin, Lake Geneva, WI, for plaintiff.

Richard G. Kalkhoff, Vlasak, Britton & Konkel, S.C., Milwaukee, WI, for defendants.

## DECISION AND ORDER

REYNOLDS, District Judge.

Brian J. Kaminski ("Kaminski") alleges that Whitewater, Wisconsin, police officers Timothy Gray ("Gray") and Edward Parker ("Parker") violated his constitutional rights by arresting him without probable cause, failing to conduct a timely probable cause hearing following the arrest, subjecting him to an inherently suggestive identification procedure, depriving him of counsel during a lineup, conducting an unlawful search, and failing to give a timely *Miranda* warning. Kaminski also claims that the City of Whitewater failed to adequately train and supervise its police employees. Kaminski filed suit on September 3, 1993, under 42 U.S.C. § 1983, and, on September 15, 1994, defendants filed a motion for summary judgment. The court shall GRANT this motion, for the reasons stated below. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

### I. FACTS

Shortly before 3:00 a.m. on November 22, 1992, University of Wisconsin–Whitewater student Julie Larsen ("Larsen") reported to the Whitewater Police Department that she had just been sexually assaulted by an intruder in her dormitory apartment. She reported that a strange man came into her bed while she was asleep and touched her breasts and stomach. The man claimed that Larsen had invited him to her apartment, but Larsen

claimed she did not know him and directed him to leave. The man left when Larsen threatened to call the police, but as he left, she was able to view him in her lighted kitchen. (Sept. 12, 1994 Larsen Aff. Ex. A at 3.) Larsen described the suspect to the police as a white male approximately five feet ten inches or six feet tall, medium build, with very short brown hair, small eyes, a round face, a "plaidish" shirt and blue jeans.

At 3:07 a.m., Officer Gray stopped Kaminski, who matched a description of the suspect, approximately five blocks from Larsen's apartment. Kaminski insisted he had been at his friend Michelle Glackin's ("Glackin") apartment and had just left at 3:05 a.m. (July 19, 1994 Kaminski Dep. at 16.) The officers ascertained that Kaminski was a 19–year–old University of Wisconsin–Whitewater student and had been drinking alcohol, and they advised him that he was under arrest for underage drinking.[1] (Sept. 13, 1994 Parker Aff. Ex. A at 2.) They also searched Kaminski and found him in possession of a driver's license of a person named Jeffrey J. Leopold, age 22.[2]

The officers handcuffed Kaminski and drove to Larsen's apartment, where Larsen was given the opportunity to view Kaminski from approximately 20 feet away as he sat in the light of the back seat of the squad car. Larsen stated that she was certain that Kaminski was the suspect. The officers then advised Kaminski that he was under arrest for burglary and sexual assault, and they transported him to the Whitewater police station at approximately 3:30 a.m.

While at the police station, Kaminski urged the officers to contact Glackin and her roommate Tracey Ciszewski in order to verify his alibi. At approximately 4:00 a.m., Parker met with Glackin and Ciszewski, who confirmed that Kaminski had been at their apartment. Glackin, however, stated that Kaminski had left at approximately 2:45 a.m., 20 minutes earlier than the time Kaminski told the officers he had left. (*Id.* at 4.)

Kaminski also requested that Larsen be brought into the police station to see him in a better light, because he believed she would change her mind about him being the suspect. (July 19, 1994 Kaminski Dep. at 35.) Larsen agreed to view Kaminski again, and Kaminski was placed in a room with a one-way mirror. Upon this second viewing of Kaminski, Larsen again claimed that she was positive that he was the man who entered her apartment and sexually assaulted her.

At approximately 4:45 a.m., Kaminski was given his *Miranda* rights and, two hours later, he was taken to the Walworth County Jail. On November 24, 1992, two days later, Kaminski made his initial appearance in Walworth County Circuit Court, and on November 30, 1992, the district attorney's office filed a criminal complaint against him. A preliminary hearing was held on January 8, 1993, and on February 23, 1993, charges against Kaminski were dropped.

## II. ANALYSIS

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The court must draw all reasonable inferences from the record in fa-

---

1. Although Kaminski denied he had been drinking, Gray observed that his eyes were red and watery and that he smelled of intoxicants. (Sept. 13, 1994 Gray Aff. Ex. A.) Gray administered a preliminary breath test with a result of .04%. (*Id.*)

2. Kaminski alleges that he had found the license of Leopold, who was a friend of his and who had dropped the license, and that he was planning to return it. (July 19, 1994 Kaminski Dep. at 17.)

vor of the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989).

## A. *Doctrine of Qualified Immunity*

In this case, defendants have pleaded qualified immunity as an affirmative defense. Under the qualified immunity doctrine, "government officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[3]

The Supreme Court recently clarified the analytical framework with which qualified immunity claims should be examined. In *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Court stated:

> A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.

*Id.* at 232, 111 S.Ct. at 1793. The Seventh Circuit has construed *Siegert* as establishing a two-step analysis for cases involving alleged constitutional violations and a qualified immunity defense: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1249 (7th Cir.1994); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994). The Seventh Circuit has further explained: "An analysis of qualified immunity is appropriate only *after* resolution of the purely legal question of whether [the plaintiff] has alleged a violation of a constitutional right." *Sivard v. Pulaski County*, 17 F.3d 185, 189 (7th Cir.1994) (emphasis added). A negative answer to the first question of the *Siegert* analysis ends the inquiry there and conclusively resolves the matter in favor of the defendant. *Sheik–Abdi*, 37 F.3d at 1249.

With regard to the second prong of the test, the Seventh Circuit has remarked that "the touchstone of a qualified immunity inquiry is the clarity of the state of the law in relation to the defendant's conduct at the time the conduct occurred." *Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 496 (7th Cir. 1993). The plaintiff bears the burden of establishing the existence of a clearly established constitutional right, and this burden is heavy. *Donovan*, 17 F.3d at 951.

Accordingly, this court shall assess each of Kaminski's claims, first examining whether Kaminski has established a constitutional violation as a matter of law, and, if so, examining whether the constitutional standard was "clearly established" at the time the conduct occurred, in November 1992.

## B. *Alleged Constitutional Violations*

In his complaint, Kaminski alleges that the defendants violated his due process rights under the Fourth and Fourteenth Amendments by: (1) arresting him without probable cause; (2) denying him a timely probable cause hearing after his arrest; (3) subjecting him to an inherently suggestive lineup and identification procedure; and (4) denying him access to counsel during the lineup. In his response brief to defendants' motion for summary judgment, Kaminski asserts two additional constitutional violations: (1) that he was subjected to an unlawful search and (2) that he was given a *Miranda* warning in an untimely fashion. Lastly, Kaminski claims that defendant City of Whitewater is liable for (1) having a "deliberate policy of acquiescence of their police department's perpetual practice of picking up and harassing local college students," and (2) failing to adequately train and supervise its police employees. The court shall examine these claims in turn.

### 1. Probable Cause to Arrest

█ For an arrest to be constitutionally valid, it must have been made with probable cause. Officers have probable cause if, at the moment the arrest was made, "the facts and

---

**3.** Courts have created the doctrine of qualified immunity under the assumption that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions. *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994).

circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing" that the petitioner had committed or was committing an offense. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). When Gray and Parker arrested Kaminski, they possessed reasonably trustworthy information to warrant the belief that Kaminski had committed burglary and sexual assault against Julie Larsen. Kaminski was a close match of the suspect with respect to both physical appearance and clothing style. Kaminski, like the suspect described by Larsen, was 5'10" with a medium build and had short brown hair, a "plaidish" shirt, and blue jeans. Moreover, Kaminski was stopped just a few blocks from the victim's apartment shortly after she reported the crime. Lastly, there is no evidence in the record to suggest that Larsen was an untrustworthy person or that she had ever made false allegations.

That charges against Kaminski were ultimately dropped does not affect the probable cause determination made at the time of the arrest. The Seventh Circuit has held that if police officers "arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded." *Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194, 200 (7th Cir.1985) (quoting *McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir.1984)).

Furthermore, Gray possessed reasonably trustworthy information that Kaminski had violated the state law against underage drinking. Gray reported that he observed Kaminski's eyes to be red and watery, that he smelled alcohol on his breath, that a breath test confirmed that he had consumed

alcohol, and that Kaminski was a minor. Therefore, the officers had probable cause to arrest Kaminski on the additional ground that he had violated the state law against underage drinking.

2. Probable Cause Hearing

■ Kaminski alleges that defendants violated his constitutional right to a prompt judicial probable cause hearing following his warrantless arrest. The Supreme Court has indeed held that where an arrested individual does not receive a probable cause determination within 48 hours, the government must demonstrate the existence of "a bona fide emergency" or "extraordinary circumstance" to pass constitutional muster. *County of Riverside v. McLaughlin,* 500 U.S. 44, 57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991). *See also Powell v. Nevada,* —— U.S. ——, ——, 114 S.Ct. 1280, 1281, 128 L.Ed.2d 1 (1994) (" 'prompt' generally means within 48 hours of the warrantless arrest; absent extraordinary circumstances, a longer delay violates the Fourth Amendment").[4]

■ However, Kaminski fails to establish that he was denied a probable cause determination for a length of time in excess of 48 hours. He was arrested at approximately 3:30 a.m. on Sunday, November 22, 1992, and his probable cause hearing took place at some unspecified time on Tuesday, November 24, 1992. While it is probable that the hearing occurred in excess of 48 hours following arrest, the facts presented in the record do not allow the court to reach this conclusion.[5]

3. Inherently Suggestive Identification Procedure

■ Kaminski also alleges that defendants subjected him to an inherently suggestive initial identification and lineup, in violation of

---

4. Even if a probable cause hearing is provided within 48 hours of arrest, a plaintiff still may allege a constitutional violation if the hearing was "delayed unreasonably." *McLaughlin,* 500 U.S. at 56, 111 S.Ct. at 1670; *Willis v. Chicago,* 999 F.2d 284, 287 (7th Cir.1993).

5. Even if Kaminski could establish that he was denied a probable cause hearing within 48 hours, he would still have to show that this presumptive constitutional right was "clearly established" at the time of the violation. *Donovan,* 17 F.3d at 951. Kaminski has made no such showing.

the Fourth Amendment.[6] The court concludes that defendants' identification procedure was permissible. And even if Kaminski was subjected to an unnecessarily suggestive showup or lineup, the Seventh Circuit has held that there is no right to an impartial lineup as long as the evidence gained through that lineup is not used against the defendant at trial. *Hensley v. Carey,* 818 F.2d 646, 650 (7th Cir.1987). In articulating its rationale for this principle, the Seventh Circuit stated:

> The rule against admission of evidence from unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983.

*Id.* at 649. In the case at bar, all charges against Kaminski were dropped within three months of the incident. Therefore, he was not denied a right to a fair trial, and he may not bring a § 1983 claim based on inherently suggestive procedures.

■ Furthermore, the court observes that defendants' identification procedure was permissible. To violate due process, an identification procedure used by police must be "unnecessarily suggestive" and create "the likelihood of misidentification" under the totality of the circumstances.[7] *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *United States v. Clark,* 989 F.2d 1490, 1495 (7th Cir.1993). Factors to be considered by the court in conducting this analysis include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty

demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Armstrong v. Young,* 34 F.3d 421, 428 (7th Cir.1994) (indicating that improper identification claims be analyzed according to the factors set forth in *Manson* ).

■ Applying the *Manson* analysis to the facts of this case, the court concludes that the police officers' treatment of Kaminski was proper. First, the victim, Larsen, had sufficient opportunity to view the suspect after he committed the offense. Although Larsen was asleep when the suspect began sexually assaulting her, they subsequently engaged in a face-to-face confrontation in which the suspect contended that she knew him and had invited him over and Larsen denied this. In addition, she stated that she had the opportunity to view the suspect in her lighted kitchen.

Second, Larsen paid close attention to the suspect for identification purposes. In addition to her opportunity to view the suspect in a lighted area and engage in a face-to-face confrontation, she notified the police about the incident within several minutes of its occurrence and gave a specific description of the suspect's physical appearance and clothing. These facts suggest that Larsen paid close attention to the suspect and support a finding of reliability.

Third, Larsen provided the police with an accurate description of the suspect prior to the showup. She described him as a white male, approximately five feet ten inches tall,

---

6. Although the parties in this case refer to the police station identification of Kaminski as a "lineup," it would be more accurate to categorize it as a "showup," which is a one-to-one confrontation between suspect and witness to crime. But the law is similar: "evidence of a showup without more does not violate due process." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *see also Manson v. Brathwaite,* 432 U.S. 98, 113 n. 13, 97 S.Ct. 2243, 2252 n. 13, 53 L.Ed.2d 140 (1977) ("a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest").

Furthermore, the court has some doubt that Kaminski was subjected to a showup, since the

record in this case reveals that it was Kaminski himself who requested that Larsen be brought to police headquarters to view him, believing that she would change her mind about him being the suspect.

7. While the practice of showing suspects singly to victims for the purpose of identification has been widely condemned, *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967), so too has the practice been praised because immediate confrontations permit the quick solution of crime and allow identification before suspects have altered their appearance and while the victim's memory is fresh. *Johnson v. Dugger,* 817 F.2d 726 (11th Cir.1987).

medium build, with very short brown hair, small eyes, a round face, a "plaidish" shirt and blue jeans. Kaminski matched this description. Since there is no evidence or argument in this case that Kaminski did not fit Larsen's initial description, the court shall assume that he did.

The fourth inquiry of *Manson* is the level of certainty demonstrated by the victim at the showup. Based on the police report of Sergeant Parker, Larsen was confident that Kaminski was the suspect. Upon viewing him in the lighted back seat of the squad car, Larsen stated: "That's him. That's him." (Sept. 13, 1994 Parker Aff. Ex. A at 3.) When Parker asked if she was "absolutely positive" that Kaminski was the suspect, Larsen stated that she had "no doubts at all." (*Id.*) Larsen again stated that she was "positive" that Kaminski was the suspect, when she viewed him through a one-way mirror at the police station. (*Id.* at 5.) Larsen's unwavering level of certainty supports the reliability of her identification.

The final *Manson* consideration is the amount of time that elapsed between the crime and the confrontation. The first showup of Kaminski occurred approximately 30–45 minutes after Larsen was assaulted, and the second showup took place approximately an hour after the first one. These periods are well within the timeframe that the Seventh Circuit has held to be reliable for the purposes of the *Manson* test. *United States v. Clark,* 989 F.2d 1490, 1497 (7th Cir.1993). Weighing the totality of circumstances in this case against the inherently suggestive influence of the showup procedure, this court holds that the police officers did not subject Kaminski to an improper identification procedure.

### 4. Lack of Attorney at Lineup

■ Kaminski alleges that defendants' failure to offer him counsel at the police station identification violated his constitutional right to counsel. Kaminski misconstrues the law. While criminal suspects are entitled to counsel during postindictment lineups, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), this right has not been extended to preindictment lineups.

*Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The constitutional right to counsel attaches only at or after the initiation of adversary judicial proceedings because it is only at that time that "a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) (quoting *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882). Kaminski had no constitutional right to counsel during the police station showup.

### 5. Unlawful Search

Kaminski's claim that the officers violated his Fourth Amendment right against unreasonable searches and seizures is also without merit. Kaminski argues that police officers may search arrestees only for self-protection purposes if they fear that the arrestee is armed, and that the search of Kaminski was unlawful because there was no reason to believe he was armed. Kaminski misconstrues the law of search incident to an arrest.

■ The Supreme Court has held that when an arrest is made, it is reasonable for a police officer to search the arrestee either to remove any weapons that the arrestee might use to resist arrest, or "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). Since Gray and Parker had arrested Kaminski for underage drinking, they conducted a valid search in order to determine whether he was in possession of alcoholic beverages. And although the officers' search revealed that Kaminski was in possession of another person's driver's license, the record does not indicate that any charges were brought against Kaminski for possession of this license.

### 6. Miranda Warning

■ Kaminski also alleges that his constitutional rights were violated as a result of defendants' failure to inform him of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86

S.Ct. 1602, 16 L.Ed.2d 694 (1966), in a more timely fashion. Kaminski was stopped at 3:07 a.m. and given a *Miranda* warning nearly two hours later. However, this delay may not serve as the basis of § 1983 liability. As the Seventh Circuit stated in *Hensley v. Carey*, 818 F.2d 646 (7th Cir.1987):

> The *Miranda* decision does not even suggest that police officers who fail to advise an arrested person of his rights are subject to civil liability; it requires, at most, only that any confession made in the absence of such advice be excluded from evidence.

*Id.* at 650 (quoting *Bennett v. Passic*, 545 F.2d 1260, 1263 (10th Cir.1976)). Because Kaminski did not confess to any crimes in the absence of a *Miranda* warning, and since charges were ultimately dropped, defendants cannot be held liable under § 1983 for failing to provide Kaminski with a *Miranda* warning.

### 7. Municipal Liability

 Kaminski further alleges that the City of Whitewater fails to adequately train and supervise its police officers and maintains a deliberate policy of allowing its officers to harass local college students. Kaminski, however, fails to provide any evidence to support these allegations. The Supreme Court has held that a municipality may be found liable under § 1983 only where the municipality itself caused the constitutional violation at issue. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To establish *Monell* liability based on failure to train, a plaintiff must show a specific deficiency in a city's training program as well as a direct causal link to the alleged constitutional deprivation. *Canton v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989). Section 1983 liability attaches only when evidence is introduced showing that a city's failure to train reflects "deliberate indifference" to the constitutional rights of its residents. *Id.* at 392, 109 S.Ct. at 1206. Kaminski has provided no evidence of a deficiency in training, a causal link to the alleged constitutional violations, or deliberate indifference. His complaint alleges such, but he provides no further substantiation. The Supreme Court has stated:

*Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.

*Id.* at 389, 109 S.Ct. at 1205 (footnote omitted). There is nothing in the record indicating that the City of Whitewater was on notice of, or deliberately indifferent to, any constitutional violations. In light of the fact that Kaminski has submitted no evidence of unconstitutional conduct, he has failed to show a direct causal link between a policy and an alleged constitutional deprivation. *Donovan v. City of Milwaukee*, 17 F.3d 944, 955 (7th Cir.1994).

## III. CONCLUSION

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment is GRANTED, and this case is DISMISSED WITH PREJUDICE.