Shawn SEEVERS and Gloria
Seevers, Plaintiffs,

v.

Franklin W. ARKENBERG, Defendant.

No. NA 87–15–C.

United States District Court,
S.D. Indiana,
New Albany Division.

Dec. 6, 1989.

William E. Goering, II, Eckert, Alcorn, Goering & Colussi, Madison, Ind., for plaintiffs.

Tom G. Jones, Jones, Loveall, Johnson & Bailey, Franklin, Ind., James E. Bourne, Wyatt, Tarrant, Combs & Orbison, New Albany, Ind., for defendant.

## ENTRY

BARKER, District Judge.

In *The Trial*, Franz Kafka depicts the plight of Joseph K., a young man entangled in the arcane and inscrutable webs of the law. Unable to navigate "the system"'s labrinthine ways on his own, Joseph K. implores the aid of a distinguished yet equally cryptic attorney. Instead of illuminating his client's situation, however, the attorney only compounds the darkness. Thus the legal system, which should mediate between an individual and society, itself became a vehicle of alienation used by the attorney against his own client.

The present case, though not as fantastic as Kafka's version, uncomfortably echoes the estrangement produced when attorneys manipulate the law to beguile laymen. Here the plaintiffs, Gloria and Shawn Seevers, believed defendant Arkenberg to be their champion and guide in the legal arena, until events revealed a startling metamorphosis: Arkenberg had not protected the plaintiffs because, unbeknownst to them, he represented an adverse interest. This situation, detailed below, gave rise to the present action.

The Seevers have charged Arkenberg with malpractice, deceit, fraud, breach of an equitable duty, and a civil rights violation. The defendant has moved for summary judgment on all of the charges except the civil rights claim, which he has moved to dismiss. Arkenberg's principal defenses are that collateral estoppel prevents the litigation of these issues because the plaintiffs litigated and lost them in state court, and that the claims are barred by the statute of limitations. For the reasons articulated below, the court GRANTS the motion to dismiss Count V, and GRANTS the defendant summary judgment on Count I, but DENIES summary judgment on Counts II–IV.

*Background*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The purpose of Rule 56 is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir.1988). If the nonmovant bears the burden of proof at trial on a dispositive issue, Rule 56 directs him to adduce specific facts demonstrating that the issue is genuinely in dispute:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id.* 477 U.S. at 322–23, 106 S.Ct. at 2552.

The burden thus placed upon the nonmovant is not unduly onerous, however, because "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

The facts in the present case, construed favorably for the Seevers, are as follows:

In January of 1983 Gloria and William Seevers consulted with attorney Arkenberg about an intended dissolution of their marriage. The Seevers wanted to handle the dissolution and disposition of property amicably, so they decided to engage a single attorney to do the legal work, rather than retaining separate counsel. Arkenberg seemed the natural choice for this common representation, because he had previously represented the Seevers in connection with their landfill business; he was their "family lawyer" and, like a country doctor, had been consulted to remedy all their legal ills. The defendant apparently agreed to the joint representation provided that no conflict of interests arose, while cautioning that conflict would necessitate separate representation.[1] Subsequent events show that in undertaking this double representation, Arkenberg had grabbed the tiger by the proverbial tail. The record reflects that the Seevers basically agreed upon how the property should be divided, and simply wanted Arkenberg to prepare papers giving legal effect to the agreement.[2] The Seevers consulted with Arkenberg several times, sometimes together and sometimes separately, concerning the preparation of what came to be styled the "Guaranty Agreement" (or "the Agreement"). At some point during this time the Seevers' son Shawn also became involved in the discussions.[3]

Consequent to these meetings Arkenberg drafted the Guaranty Agreement; this document references a "Property Settlement Agreement" ("PSA"), and grants Shawn Seevers a remainder interest in fee simple in the property described in the PSA. The Guaranty Agreement also provides that upon William Seevers' death, Shawn will pay Gloria either $300 per week or $20,000 total. This provision obviously contemplates that Shawn will have come into possession of the real estate detailed in the PSA. All three of the Seevers signed this document, but Arkenberg never filed it.

The referenced PSA effects a curious division of the Seevers' property. While Gloria received a used Cadillac and a player piano, William received title to over $1 million worth of real estate, which is described in Schedule "A". One reason that the property was split in this seemingly inequitable manner was that the landfill company constituted the bulk of the Seevers' assets, and they did not want to break it up. The business had been in the family for several generations, and it was intended that Shawn continue the business after William's death. More importantly, Gloria and Shawn believed the PSA would be read in conjunction with the Guaranty Agreement, and that the real estate would ultimately vest in Shawn, who in turn would look after his mother. Arkenberg, responding to a question from Shawn, opined that the Guaranty Agreement was a "good deal" for all concerned.

Two days before the dissolution hearing, Gloria spoke with Arkenberg and expressed trepidation at attending the hearing, because she feared William would be present. Arkenberg said he did not know if William would attend, and promised to meet Gloria outside the court house on the day of the hearing to tell her if William was there. William did not appear, and Arkenberg accompanied Gloria into court and they sat down at the same table together. Though Arkenberg has subsequently declared that he was representing only William at that hearing,[4] it seems clear that Gloria thought he was represent-

---

1. Deposition of Gloria Seevers, pp. 8–9. The record also suggests that Arkenberg told the Seevers that he could not represent either of them if conflicts developed. *Id.* at 9.

2. *Id.* at 11.

3. Arkenberg had previously represented Shawn on several occasions, ranging from Shawn's divorce in 1978 to "traffic tickets and minor stuff." Deposition of Shawn Seevers, p. 10.

While there was no on-going business relationship between Shawn and Arkenberg, the record suggests that Shawn sought Arkenberg's help whenever legal issues arose. *Id.* at 11. It is also worth noting that Shawn's legal expenses (except for the divorce) were paid for by his parents' landfill company.

4. Deposition of Frank Arkenberg, p. 71.

ing her as well. When the presiding judge evidenced surprise at the allocation of property, Gloria explained that she did not want the landfill business to be split up, and the judge accepted this explanation.[5] No record of these proceedings was made.

Approximately one year later, William Seevers decided to sell his business to Rumpke of Indiana Corporation, a competitor. The Seevers' landfill business was apparently stagnating, in part because illness precluded William from running it, and Shawn (who had been managing the business) had been dismissed by William after a falling-out. The attorney who negotiated the sale to Rumpke was none other than Franklin Arkenberg who, having personally drafted the un-filed Guaranty Agreement, knew that the Seevers had intended that Shawn have a remainder interest in fee simple for the landfill real estate as part of the dissolution settlement. Arkenberg, however, took no steps to inform either Gloria or Shawn of this development,[6] and drafted a sale agreement with Rumpke representing that William Seevers was the sole owner of the real estate (which he was because Arkenberg failed to file the Guaranty Agreement) and had full authority to convey its title.[7] Upon learning that the landfill acreage had not been included in the legal descriptions presented to the state court at the dissolution hearing, Arkenberg secured a Nunc Pro Tunc decree (which he apparently typed himself)

from the state court which conveyed title to that land to William. The plaintiffs were given no notice of this proceeding.[8] Arkenberg argues that there was nothing underhanded in obtaining the Nunc Pro Tunc decree because it merely stated what all parties had previously agreed to, namely that the real estate would go to William. This assertion is disingenuous. Had the Guaranty Agreement been filed, the Nunc Pro Tunc decree would have been consistent with the terms of Gloria and William's dissolution negotiations. But when coupled with the pending sale to Rumpke and the fact that the Guaranty Agreement had not been filed, the Nunc Pro Tunc decree effectively cut off both Shawn's remainder interest and Gloria's allowance.

The consequences of Arkenberg's actions are as dismal as they are predictable. When William Seevers died in 1985,[9] Shawn and Gloria learned that their rights to the family business—for which he had left school, and to which she had given her life's energy—no longer existed, and that the very man they had trusted to protect these interests had been instrumental in taking them away.[10] Unlike Joseph K., however, the plaintiffs did not slit their throats in despair, but rather filed suit to regain their land or be compensated for it.

On February 12, 1987, a consolidated hearing was held in the Ripley County Circuit Court on actions brought against the

---

**5.** Gloria apparently believed that the Guaranty Agreement was among the filed papers before the judge.

**6.** The defendant argues that Shawn had constructive notice of the proposed sale because Shawn was working for Rumpke at the time and had heard about the sale. Shawn, however, thought that his father was only selling the trucks and routes of the landfill business, not the land itself. This belief was based on William Seever's oft-repeated vow never to sell the land which had been in his family for generations, and the knowledge that Rumpke still used exclusively the landfill in the next village, Batesville, rather than utilizing the land (previously) owned by Shawn's father. Gloria Seevers also believed that the family land had not been sold because of William's vows, and because she was still receiving $300 per week, supposedly from the Guaranty Agreement she thought to be in effect.

**7.** The total size of the landfill site was 80 acres. Only 65 acres were conveyed to Rumpke; the remaining "homestead" of 15 acres was eventually bought from the estate by Michael Seevers.

**8.** The factual allegations that the state court judge conspired with the defendant to deprive the plaintiffs of their civil rights by entering a Nunc Pro Tunc decree without notice will be examined *infra*.

**9.** William Seevers' will left everything to his second wife, Louise, and his son Michael. Gloria and Shawn received nothing.

**10.** It was only at this point that Arkenberg advised the plaintiffs that he could not represent them, and that they should retain a different attorney.

estate of William Seevers by Shawn and Gloria, seeking to enforce their rights under the Guaranty Agreement. At this hearing, both Shawn and Gloria testified that they believed Arkenberg was representing both William and Gloria Seevers; they also thought the Guaranty Agreement he had prepared was operative, and that it guaranteed to them the real estate and an allowance, respectively. There was some testimony concerning the Nunc Pro Tunc entry, but it focused on the decree's effect rather than on Arkenberg's role in procuring it.

Meanwhile, on January 28, 1987, the plaintiffs had filed this suit against Arkenberg in federal court, alleging attorney malpractice, deceit, and fraud. Ostensibly to protect his interests in the federal action, Arkenberg moved (two months after the close of evidence, but before the ruling) to intervene in the pending state court action on the ground that the two cases dealt with the same underlying transaction. The state court, finding that both suits implicated Arkenberg's professional reputation, and that "common questions of fact and law" were involved, granted the motion to intervene.[11] In ruling on Shawn and Gloria's suits against the estate of William Seevers, the state court made the following finding:

### Finding of Fact No. 1

The court finds that only William Seevers employed Franklin W. Arkenberg in the dissolution of marriage action between William and Gloria Seevers and in the preparation of the Guaranty Agreement between William Seevers and others. The court further finds that Franklin W. Arkenberg was obliged only to protect the interests of his client, William Seevers, and owed no duty to others.

The state court also made the following conclusions of law:

2. That the Claimants, Gloria Seevers and Shawn Seevers, have failed to establish by the evidence that attorney, Franklin W. Arkenberg, acting as counsel for William Seevers, had any obligation to protect the interests of or owed a duty to either of them in that they failed to show by the evidence that an attorney-client relationship existed between either of them and Franklin W. Arkenberg.

\* \* \* \* \* \*

6. It is the law in this state that an attorney may intervene in an action in which he is charged with personal misconduct in order to protect his reputation and any reflection upon his integrity.

7. That the Claimants, Gloria Seevers and Shawn Seevers, take nothing by way of claim against Franklin W. Arkenberg....

The plaintiffs admit that they knowingly failed to appeal from this decision.

The plaintiffs then petitioned the state court to set aside the Nunc Pro Tunc decree, and a hearing was held on this matter on July 6, 1987. On September 1, 1987, the court concluded that

[i]f in fact the court erred in entering the Nunc Pro Tunc Decree of Dissolution April 30, 1984, such error was harmless and resulted in no prejudice to the substantial rights of Gloria Seevers in that Gloria Seevers has testified that said Nunc Pro Tunc Decree of Dissolution merely spelled out and ordered the agreement and understanding of the parties with respect to disposition of their marital property at the time of the dissolution of their marriage.[12]

The facts detailed above comprise a description of a struggle by the plaintiffs to claim the rights they thought the Guaranty Agreement had secured for them. Conspicuously absent from the state court proceedings is any attempt to fasten liability

11. *Shawn Seevers and Gloria Seevers v. Estate of William Seevers and Franklin W. Arkenberg (Defendant–Intervenor)*, P–85–69, Ripley Circuit Court, May 13, 197, Finding of Fact No. 9.

12. Again, it is clear that Gloria's belief that the Nunc Pro Tunc Decree was consistent with "the

agreement and understanding of the parties with respect to the disposition of their marital property" presupposed the efficacy of the Guaranty Agreement, which secured her and Shawn's interests.

on Arkenberg. The plaintiffs sought their land, not his hide. Now that their swords are drawn, however, the state court rulings and the doctrine of collateral estoppel seem to constitute a defense as impervious as the Great Wall of China. The plaintiffs refuse to give it up, however, and seek another chance to vindicate their claims before the law.

*Section 1983 Claim*

Count V of the amended complaint alleges that Arkenberg, in concert with Judge Pictor (formerly of the Ripley County Circuit Court), violated the plaintiffs' due process rights under color of state law by obtaining the Nunc Pro Tunc decree without notice to them.[13] The defendant apparently concedes that the Nunc Pro Tunc entry was improper[14] because such entries require that the adverse party be given notice and an opportunity to be heard. *Taylor v. State*, 438 N.E.2d 275, 278 (Ind. 1982); *Stowers v. State*, 266 Ind. 403, 363 N.E.2d 978, 983 (1977). Arkenberg has nevertheless moved for dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action under which relief can be granted.

■ The plaintiffs' claim cannot be dismissed unless no set of facts could be adduced that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The facts alleged in the complaint, and all reasonable inferences drawn therefrom, are assumed to be true. *Rankow v. First Chicago Corp.*, 870 F.2d 356, 357 n. 1 (7th Cir.1989). This court is not at liberty, however, to consider allegations which do not appear in the complaint, but which are averred only in legal briefs. *Rodgers v. Lincoln Towing Service*, 771 F.2d 194, 198 (7th Cir.1985).

■ Arkenberg argues that liability cannot attach under section 1983 because he was not acting under color of state law.

It is well established that one need not be an officer of the state to act under color of state law; "[i]t is enough that [one] is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Hughes v. Meyer*, 880 F.2d 967, 972 (7th Cir.1989). But "a private party's misuse of the courts, *without more*, does not constitute state action for purposes of section 1983." *Greco v. Guss*, 775 F.2d 161, 170 (7th Cir.1985) (emphasis added); *see also Dennis v. Sparks*, 449 U.S. at 28, 101 S.Ct. at 186. *Hughes v. Meyer*, 880 F.2d at 972; *Winterland Concessions Co. v. Trela*, 735 F.2d 257, 262 (7th Cir.1984). There must be evidence that the judge and the private actor shared the common goal of depriving an individual of constitutional rights. *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 435 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987). Thus, in *Sparks* the Supreme Court refused to dismiss a section 1983 claim because the complaint alleged a "corrupt conspiracy" (*e.g.*, bribery) between the judge and the private actor. 449 U.S. at 28, 101 S.Ct. at 186. To establish a prima facie case for such a corrupt conspiracy the plaintiffs must allege:

1) an implied or express agreement between the judge and private actor to deprive a plaintiff of constitutional rights; and

2) an actual deprivation of those rights.

*See Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir.1988). Though a conspiracy may be alleged with circumstantial evidence, mere conclusory allegations of a conspiracy are insufficient to withstand a motion to dismiss, *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1352 (7th Cir. 1985) (opinion of Coffey, J.); there must be allegations of joint action, or a "meeting of minds." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir.1982). The Seventh

---

**13.** To the extent that the complaint could be construed to state a 42 U.S.C. § 1985(3) conspiracy, it is deficient because there is no indication of a class-based discriminatory animus against the plaintiffs. *See Griffen v. Breckenridge*, 403

U.S. 88, 101–102, 91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338 (1971); *Lowe v. Letsinger*, 772 F.2d 308, 311 (7th Cir.1985).

**14.** Deposition of Franklin W. Arkenberg, p. 98.

Circuit seems to require an allegation that the judge shared the private actor's *mens rea,* and used his office consciously for improper motives (*Scott v. Schmidt,* 773 F.2d 160, 165 (7th Cir.1985)) or with the intent to "inflict a wrong" on a plaintiff. *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). In the present case, however, the complaint merely asserts that Arkenberg and the judge acted "in concert," and in no way suggests that the judge acted with evil intent.[15] *Compare Mark v. Furay,* 769 F.2d 1266, 1273–74 (7th Cir.1985) (plaintiff adequately stated section 1983 claim by alleging that the law enforcement officer involved already knew that the information supporting probable cause for arrest was false); *Hudson v. Chicago Teachers Union Local No. 1,* 743 F.2d 1187, 1191 (7th Cir.1984) (state actor assisted a union in coercing public employees to finance political activities). The plaintiffs' allegations amount to no more than the assertion that a Nunc Pro Tunc decree was improperly entered. This is insufficient to demonstrate state action under section 1983.

In response to Arkenberg's motion to dismiss, the plaintiffs allege in greater detail the purportedly illicit transaction between Arkenberg and Judge Pictor. These allegations are not properly before the court, however, because they appear only in a legal brief, rather than in an amended complaint. *See Rodgers v. Lincoln Towing Service,* 771 F.2d at 198.[16] The plaintiffs' attorney might have better spent his time by including these details in the amended complaint he was ordered to submit, but failed to file. (*See* Order of 12/14/88).[17]

The defendant, citing plaintiffs' failure to comply with the above order, asks that the section 1983 claim be dismissed with prejudice. The Seevers retort that the order denied Arkenberg's motion to dismiss, but it is clear that the denial was contingent upon the plaintiffs providing more specific allegations in the contemplated amended complaint. Having disregarded an express order of this court, the plaintiffs cannot justly argue that they are entitled to another opportunity to amend their complaint.

For the reasons stated above the defendant's motion to dismiss with prejudice is GRANTED. This court nevertheless retains jurisdiction over the state law claims because the parties are citizens of diverse states. 28 U.S.C. § 1332.

*Collateral Estoppel*

■ The defendant's primary contention with respect to the remaining state law claims is that they are precluded by the doctrine of collateral estoppel. Although both sides cite federal law to support their respective positions, the "full faith and credit" statute (28 U.S.C. § 1738) requires federal courts to apply Indiana law in determining the preclusive effect of a judgment rendered by an Indiana court. *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *Donnelly v. Yellow Freight System, Inc.,* 874 F.2d 402,

---

**15.** In paragraph 69 of the Amended Complaint, the plaintiffs allege "[t]hat these acts of Frank [sic] Arkenberg, in concert with the Ripley County Court, were committed with conscious disregard for the rights of Shawn and Gloria Seevers...." This could be construed to allege that the judge consciously disregarded the Seevers' rights, but even so it is too conclusory.

**16.** It might be noted that the sworn testimony plaintiffs refer to in support of their conspiracy charge in no way indicates that Judge Pictor knowingly acted illegally. He knew that the plaintiffs were not given notice of the Nunc Pro Tunc decree, but he seemingly was not aware that this was improper. (Transcript of Hearing before Judge Gay, 7/27/87). More must be alleged to create state action).

**17.** This Order, in its entirety, reads as follows: "This matter is before the court on the defendant's motion to dismiss Count V of the complaint and on the plaintiffs' response to that motion, which the court interprets as a motion for leave to amend the complaint. Being duly advised, the court hereby GRANTS the plaintiffs' motion to amend Count V of the complaint in order to more fully detail those allegations of conspiratorial knowledge or agreement that underlie their section 1983 claim. Any such amended complaint must be filed with the court within fifteen (15) days of this entry. The court hereby DENIES the defendant's motion to dismiss Count V of the complaint."

407 (7th Cir.1989); *Wozniak v. County of DuPage*, 845 F.2d 677, 680 (7th Cir.1988).

■ At this point it may help to distinguish between the doctrines of res judicata (or "claim preclusion") and collateral estoppel (or "issue preclusion"). Under claim preclusion, a judgment on the merits in a previous suit bars a later suit involving the same parties (or their privies) which is based on the same cause of action. In contrast, issue preclusion applies when some fact has been decided in a prior suit and the same fact arises in the subsequent suit. Both Indiana and federal law observe this distinction. The defendant has argued that issue preclusion estops the plaintiffs from bringing the present claims, and the court's discussion will be confined within the parameters of that doctrine.[18] Issue preclusion is designed to obviate the relitigation of issues that have already been decided. The Indiana Supreme Court held that issue preclusion applies

> [w]here the causes of action are not the same, but where some fact or question has been determined and adjudicated in the former suit, and the same fact or question is again put in issue in a subsequent suit between the same parties.

*Town of Flora v. Indiana Service Corp.*, 53 N.E.2d 161, 163 (Ind.1944). The inquiry does not end here, for issue preclusion also requires (1) an identify of parties, and (2) mutuality of estoppel. *Hardesty v. Boler-jack*, 441 N.E.2d 243, 245 (Ind.Ct.App. 1982).

Indiana courts have not required a strict identity of parties; issue preclusion treats "privies" as if they were parties. Privies are persons "who are not parties to an action but who are connected with it in their interests [and] are affected by the judgment ... as if they were parties." *Burtrum v. Wheeler*, 440 N.E.2d 1147, 1151 (Ind.Ct.App.1982) (quoting *In re Estate of Nye*, 299 N.E.2d 854, 869 (Ind.App. 1973)). A privy has also been described as one who "after the commencement of the action, has acquired an interest in the subject matter affected by the judgment...." *Tobin v. McClellan*, 225 Ind. 335, 73 N.E.2d 679, 683 (1947).

■ In the present case, Arkenberg became a party to the state court action when he was allowed to intervene, but even putting that aside, he qualifies as privy to the action because his interests (professional reputation) would have been affected by the judgment. The mutuality of estoppel requirement, which looks to whether the party asserting collateral estoppel would have been bound if the judgment in the prior action had gone against him, is likewise satisfied.[19] *See Gorski v. Deering*, 465 N.E.2d 759, 763 (Ind.Ct.App.1984); *Burtrum v. Wheeler*, 440 N.E.2d at 1150. Arkenberg's successful intervention in the prior action fulfilled this requisite because intervenors are bound by a court's judgment. *Southport Bd. of Zone App. v. Southside Ready Mix Concrete*, 242 Ind. 133, 176 N.E.2d 112, 116 (1961); 17 I.L.E. Judgment § 420 ("In general, a third per-

---

**18.** Neither party has raised the issue of whether claim preclusion bars this suit. Under Indiana law, there are four elements to claim preclusion: (1) the former judgment must have been rendered by a court of competent jurisdiction; (2) the matter at issue was, or might have been, determined in the former suit; (3) the controversy adjudicated in the former suit was between parties to the present suit; and (4) the judgment in the former suit was rendered on the merits. *State Exchange Bank of Culver v. Teague*, 495 N.E.2d 262, 266 (Ind.Ct.App.1986). Although this court has considered the issue, it declines to address *sua sponte* a potentially dispositive matter. In any event, it is hard to imagine how attorney misconduct claims could reasonably have been raised in the state court action against the estate of William Seevers.

Thus the second prong of the claim preclusion test would be difficult to satisfy. *Cf. Hoffman v. Dunn*, 496 N.E.2d 818, 821 (Ind.Ct.App.1986) ("In claim preclusion, the critical question is whether the present claim was within the issue of the first.")

**19.** Federal law (and most other jurisdictions) has dispensed with the mutuality requirement for issue preclusion. *See Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The requirement has not wholly disappeared, however, and remains secure in the castle of Indiana law. *Cf. Hockett v. Breunig*, 526 N.E.2d 995, 999 (Ind.Ct.App.1988) (Shields, J., concurring).

son who intervenes in an action will be bound by the judgment").

■ Having determined Arkenberg's eligibility to assert issue preclusion, the court must (1) determine what the first judgment decided; and (2) examine how that determination bears on the second case. *Webb v. State*, 453 N.E.2d 180, 183 (Ind.1983). This necessitates examining the record of the plaintiffs' suit against the estate of William Seevers. The defendant bases his issue preclusion defense on the state court's finding that he represented only William Seevers in the marriage dissolution, and that "the Claimants, Gloria Seevers and Shawn Seevers take nothing by way of claim against Franklin W. Arkenberg." [20] These statements do not foreclose further inquiry, however, because to be conclusive here those issues must have been "properly presented" to the state court. *Town of Flora v. Indiana Service Corp.*, 222 Ind. 253, 53 N.E.2d 161, 163 (1944). This court declines to give conclusive effect to the findings quoted above, because they cover issues not properly before the state court.

Indiana's requirement that an issue have been properly presented to be given preclusive effect is analogous to the federal requirement that a party have been afforded a full and fair opportunity to litigate the issue in the previous action. *See Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Gray v. Lacke*, 885 F.2d 399, 406 (7th Cir.1989). This comports with the purpose of issue preclusion, which is to "limit[ ] relitigation of issues *where that can be achieved without compromising fairness in particular cases.*" *Hockett v. Breunig*, 526 N.E.2d at

1001 (Shields, J., concurring) (quoting *Blonder–Tongue Laboratories*, 402 U.S. at 328, 91 S.Ct. at 1442) (emphasis added).[21] In the particular case at bar, fairness would be compromised by issue preclusion.

The court has scrutinized carefully the transcript of the plaintiffs' state court action against the estate of William Seevers. It is true that testimony concerning the preparation of the Guaranty Agreement and PSA was offered, and that the question of who Arkenberg was representing during these transactions was peripherally bruited. But the central claims of the case concerned claims against William Seevers' estate: whether the Guaranty Agreement should be given effect, and whether the estate administrator was diminishing the assets. The finding by the court that Arkenberg represented only William Seevers was gratuitous, being wholly unnecessary to resolve the claims before the court. The defendant may argue that the intervention of Arkenberg placed that issue properly before the court. This assertion notwithstanding, the fact of intervention does not demonstrate that the issue had been "fully and fairly litigated." [22] At the hearing on Arkenberg's motion to intervene, no witnesses were called, no evidence was adduced, and no charges of attorney misconduct were levelled at Arkenberg. It does not comport with justice to allow Arkenberg to shield himself behind an unnecessary state court finding taken from a case where he was not even charged with misconduct.[23] This court believes that Indiana courts would not apply issue preclusion to the question of whom Arkenberg represented. Therefore, Arkenberg may still be held liable for his conduct vis-a-vis the

---

**20.** Conclusion of Law # 7.

**21.** The United States Supreme Court also noted that there was no "automatic formula" for applying issue preclusion, and that such decisions "necessarily rest on the trial court's sense of justice and equity." *Blonder–Tongue Laboratories*, 402 U.S. at 333–34, 91 S.Ct. at 1445.

**22.** It may be contended that the plaintiffs had the opportunity to litigate this issue, and simply failed to do so. As stated *supra*, however, it is hard to believe that a proceeding in which the

plaintiffs sought to enforce the Guaranty Agreement drafted by Arkenberg was the appropriate forum for suing Arkenberg because that very document was unenforceable.

**23.** This court does not, of course, sit in judgment on the state court's ruling to allow Arkenberg to intervene. The question remains, however, whether Indiana courts would give the factual findings related to the intervention preclusive effect in this case.

plaintiffs, and is answerable to that allegation.

*Count I—Malpractice*

The plaintiffs assert in Count I that Arkenberg committed malpractice by engaging in an attorney-client relationship with both Gloria and Shawn Seevers, and then failing to competently represent their interests.[24] The defendant contends that the statute of limitations bars this action. An attorney malpractice action alleges damage to a personal property interest, and Indiana law prescribes a two year statute of limitations for such injuries. *See Whitehouse v. Quinn*, 477 N.E.2d 270, 274 (Ind.1985); *Shideler v. Dwyer*, 275 Ind. 270, 417 N.E.2d 281, 287 (1981); Ind.Code § 34-1-2-2. Arkenberg argues that the statute of limitations began running at the time the plaintiffs heard of the sale to Rumpke in early 1984; the plaintiffs aver that it was tolled until October of 1985, two months after William Seevers died.

Generally the statute of limitations begins to run at the time a cause of action accrues, even if the plaintiff does not learn of the damaging act until later. *See Shideler v. Dwyer, id.; Tolen v. A.H. Robins Co.*, 570 F.Supp. 1146 (N.D.Ind. 1983). Where an act of malpractice could constitute constructive fraud, however, the statute of limitations does not run until the plaintiff has knowledge of the injury. *Keystone Dist. Park v. Kennerk, Dumas Burke*, 461 N.E.2d 749, 751 (Ind.Ct.App. 1984); *Madison County Bank & Trust Co. v. Kreegar*, 514 N.E.2d 279, 281 (Ind.1987). This exception only favors alert plaintiffs, because a plaintiff must show that he exercised reasonable care and diligence to discover the injury caused by the alleged malpractice. *Keystone*, 461 N.E.2d at 751. It is undisputed that both Gloria and Shawn Seevers learned of the sale to Rumpke in the spring of 1984. While they may have had good reasons to believe the sale did not include the actual landfill acreage, they should have used "due diligence to make further inquiries." *Keystone*, 461 N.E.2d

at 751. This is not too much to require of people whose very livelihood was intertwined with the subject property. The statute of limitations began sometime (the exact moment is unimportant) in the spring of 1984, and the malpractice claim was not filed until January 28, 1987. Therefore, Count I is barred by the two-year statute of limitations (Ind.Code § 34-1-2-2) and the defendant's motion for summary judgment on this count is accordingly GRANTED. Fed.R.Civ.P. 56(c).

*Counts II–III*

In his answer dated March 20, 1987, Arkenberg asserts the statute of limitations as an affirmative defense to all of the plaintiffs' claims. Arkenberg argued this point in his legal briefs only with respect to Count I, but the inclusion of the defense in the responsive pleading preserves it with respect to Counts II–IV.

Count II charges Arkenberg with attorney deceit under Ind.Code § 34-1-60-9. This statute provides that

[a]n attorney who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge or a party to an action or judicial proceeding commits a class B misdemeanor, and he shall also forfeit to the party injured treble damages, recoverable in a civil action.

This statute does not create a new cause of action, but rather provides treble damages for actions based on the common law action of deceit. *Anderson v. Anderson*, 399 N.E.2d 391, 402–403 (Ind.App.1979). To establish a claim for deceit a plaintiff must show that

a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.

---

**24.** The facts alleged and the legal standard for summary judgment have been adequately detailed *supra*.

*Id.* at 403. Very few cases have interpreted the statute, and none have addressed what statute of limitations applies to it. The Indiana Supreme Court has held that where it is unclear which statute of limitations is apposite, courts should be guided by the nature of the alleged harm. *See Whitehouse v. Quinn,* 477 N.E.2d at 274.

Although attorney malpractice claims are analogous to attorney deceit claims, the nature of the deceit action most closely resembles an action for fraud. Therefore the appropriate statute of limitations is that applicable to fraud, which is six years. Ind.Code § 34–1–2–1. The plaintiffs are well within this period.[25]

■ The defendant argues that he is entitled to judgment as a matter of law on Counts II and III because any alleged misrepresentations were merely "future promises" or "expressions of opinion." *See Royal Business Machines v. Lorraine Corp.,* 633 F.2d 34, 45 (7th Cir.1980) (applying Indiana law). This argument might prevail if Arkenberg had done no more than opine to the plaintiffs that the Guaranty Agreement was a "good deal." But Arkenberg made many other representations which created the impression that their interests in the landfill property were protected. It is immaterial that the state court found that the Guaranty Agreement was an executory promise to convey the property in the future;[26] the relevant inquiry concerns what Arkenberg initially represented the Agreement to be, not what its ultimate legal effect turned out to be. Taken as a whole, the record arguably suggests that Arkenberg represented to the plaintiffs that their interests were protected *at that moment,* that is, when the final dissolution order was entered by the court, not that they would be protected at some future date. The facts adduced, construed favorably to the Seevers, would support a finding that Arkenberg represented to the plaintiffs that they were the present owners of a vested future interest in the real estate described above. The alleged fraud has been adequately alleged, and there appear to be genuine issues of material fact surrounding the claim. Therefore, the defendant's motion for summary judgment on Counts II and III is DENIED.

*Count IV*

■ The plaintiffs' last claim against Arkenberg is for breach of an equitable duty and constructive fraud. Constructive fraud is "the breach of a legal or equitable duty which is fraudulent because of its tendency to deceive others...." *Sanders v. Townsend,* 509 N.E.2d 860, 865 (Ind.Ct.App.1987). The elements of constructive fraud are:

(1) a duty existing by virtue of the relationship of the parties;

(2) representation or silence which is deceptive;

(3) proximate cause, or reliance; and

(4) resulting injury to the plaintiff.

*Id.* at 865. The defendant relies on collateral estoppel, asserting that he neither owed a duty to nor had a special relationship with the plaintiffs, because the state court found that only William Seevers was Arkenberg's client. As discussed *supra,* this issue was not properly before the state court, so that finding of fact cannot be dispositive. Arkenberg's second line of defense—that "undisputed facts show the Defendant acted as the attorney for William Seevers only"—is equally uncompelling. The record evidences a common confusion as to whom the defendant represented. Arkenberg concedes that he told William and Gloria that he could represent both of them, provided no conflict arose.[27] A plausible reading of the record suggests that

---

**25.** The statute of limitations defense is ineffective as to Counts III and IV as well, because they too sound in fraud.

**26.** This finding would collaterally estop an action to enforce the Guaranty Agreement, as the efficacy of the Agreement was properly before the state court. The present action does not, however, put that finding at issue.

**27.** It bears mention that Arkenberg was ethically obliged to withdraw from representing *either* party once a conflict arose. *See* Rules of Professional Conduct, Rule 2.2. *See also* Rule 4.3 ("When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding").

before her husband's death, Gloria knew of no conflicts that would have terminated the representation, and thus continued to rely on Arkenberg to protect her interests.[28] It cannot be held as a matter of law that no confidential relationship existed between the plaintiffs and the defendant. This is a factual issue for the jury to determine. This material issue is genuinely and fiercely disputed; therefore the defendant's motion for summary judgment on Count IV is DENIED.

*Conclusion*

The defendant's motion to dismiss with prejudice Count V is GRANTED. The defendant's motion for summary judgment is GRANTED with respect to Count I, and DENIED with respect to Counts II–IV. Because there are no further motions pending, and this case has already languished for several years, it takes priority on the court's docket, and will be set for trial during the March 1990 term of court in New Albany.

It is so ORDERED.

**28.** Shawn also apparently believed that Arkenberg was representing him during the dissolution negotiations.

Q. You understood during this time that Frank was representing your father, didn't you?
A. No, sir.
Q. Who did you think he was representing?
A. Mom and Dad both.
Q. How about you?
A. Well yeah me too.
Deposition of Mr. Shawn Seevers, 10/6/87, p. 25.