900 F.2d 953
 16 Fed.R.Serv.3d 60
 Harold MANN and Jean Mann, Plaintiffs,
James Thomas Sloan, Jr., Frederick J. Farrer, Gary C.
Newton; and Sloan, Benefiel, Farrer, Newton &
Glista; and Sloan, Newton & Stevens, Appellants,
v.
G & G MANUFACTURING, INC., a Nebraska corporation, Defendant-Appellee.
 No. 88-1622.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 22, 1989.
Decided April 12, 1990.
Rehearing and Rehearing En Banc Denied May 24, 1990.
 
 Gary C. Newton, Sloan, Benefiel, Farrer, Newton & Glista, Kalamazoo, Mich., for plaintiffs.
 Terrence J. Lilly (argued), Lilly, Domeny & Byrne, Kalamazoo, Mich., for appellants.
 Mark H. Verwys (argued), Paul L. Nelson, David L. Harrison, Tolley, Fisher & Verwys, Grand Rapids, Mich., for defendants-appellee.
 Before KEITH, JONES and GUY, Circuit Judges.
 KEITH, Circuit Judge:
 
 
 1
 Attorneys James Thomas Sloan, Jr., Fredrick J. Farrer, and Gary C. Newton, and the current or former law firms of Sloan, Benefiel, Farrer, Newton & Glista, and Sloan, Newton & Stevens (collectively "plaintiffs' counsel"), appeal from the district court's judgment imposing sanctions pursuant to Federal Rule of Civil Procedure 11. For the following reasons, we AFFIRM in part and REVERSE in part.I.
 
 
 2
 On November 9, 1982, plaintiff Harold Mann suffered severe leg injuries when his clothing became entangled in the power take-off shaft ("PTO shaft") of the grain elevator ("auger") that he was operating on his farm in Constantine, Michigan. Mr. Mann and his wife, Mrs. Jean Mann (collectively "plaintiffs"), retained counsel to represent them in a products liability action against the auger's manufacturer, defendant Hutchinson Division of Lear Siegler, Inc. ("Hutchinson").
 
 
 3
 In May and June 1983, plaintiffs' counsel took statements from: Paul Trojan, a Professor of Metallurgical Engineering at the University of Michigan; Denny Mann, plaintiffs' son; Raymond Stutzman, the previous owner of the auger; and Robert Brewer, Chief of the Constantine Police Department, who investigated the accident.[1]
 
 
 4
 In his discussion with plaintiffs' counsel, Dr. Trojan opined that there were substantial defects in the plastic guard which was designed to protect the PTO shaft of plaintiffs' auger. Dr. Trojan explained: first, that due to its exposure to the environment, the plastic guard had decayed substantially and could not withstand the force of a man falling against it; second, that the guard was poorly designed because its two pieces could separate leaving a guard system which did not cover the entire shaft; and third, that the guard was improperly manufactured from plastic when a metal guard would have been less susceptible to environmental damage.[2] See Joint Appendix ("J.A.") at 456-97.
 
 
 5
 In his statement, Mr. Stutzman explained that he purchased the subject auger "used," and at that time, its PTO shaft did not have a complete guard. After owning the auger for two years, Mr. Stutzman sold it to Mr. Mann "in the same condition." J.A. at 685. Denny Mann indicated that during the time plaintiffs owned the auger, its PTO shaft did not have a complete guard. Thus, the PTO shaft remained effectively uncovered. He specifically stated that the auger's "complete power take-off [shaft] was there. You have a piece that slides in ... And half that goes to the tractor. The plastic guard wasn't there." J.A. at 671-72.
 
 
 6
 When plaintiffs' counsel spoke to Chief Brewer, he explained that immediately after the accident, portions of Mr. Mann's clothing were caught on a "sharp projection on the bare, unguarded portion of the PTO shaft." Chief Brewer concluded that "at the time I saw the projection, I felt that this projection was the location where Mr. Mann's clothing first began to be entangled on the PTO shaft." J.A. at 687.
 
 
 7
 After this preliminary inquiry, plaintiffs' counsel filed a complaint against Hutchinson on February 27, 1984. Plaintiffs alleged that defects in Hutchinson's design and/or manufacture of the auger sold to Mr. Mann were the proximate cause of his injuries.
 
 
 8
 Hutchinson deposed Mr. Mann on March 28, 1985. Mr. Mann testified that at the time of the accident, he was an experienced farmer; that he knew why farm machinery should remain guarded; and that he knew it was a good safety practice to keep loose clothing away from operating farm machinery. Mr. Mann stated that he had examined his auger and was aware that more than half of the guard on the PTO shaft was missing. Mr. Mann also indicated that he knew that the entire PTO shaft was supposed to be guarded; and that he recognized that his auger was less safe without a guard. Mr. Mann concluded that if the entire PTO shaft had been guarded, his accident might not have occurred.
 
 
 9
 On April 8, 1985, plaintiffs' counsel deposed Hutchinson's Vice-President of Engineering, Dwight Beninga. Mr. Beninga explained that his firm generally supplies augers with PTO shafts and guards produced by G & G Manufacturing, Inc. ("G & G"). After reviewing photographs of Mr. Mann's accident, however, Mr. Beninga concluded that plaintiffs' auger did not contain a PTO shaft produced by G & G and supplied by Hutchinson. Mr. Beninga offered several reasons for his conclusion: first, the plaintiffs' PTO shaft separates and the PTO shaft that Hutchinson supplies was "produced in such a way that the two parts would not separate;" second, the plaintiffs' PTO shaft does not contain a pinhole and PTO shafts supplied by Hutchinson have pinholes; and third, the "universal joint [of the plaintiffs' PTO shaft] ... is just not similar to the kind that Hutchinson supplies. This appears to be some sort of forging or casting construction. The Hutchinson-supplied units are a malleable iron stamping kind of construction." J.A. at 603.
 
 
 10
 Even though the initial discovery revealed: that the PTO shaft was neither supplied by Hutchinson nor produced by G & G; that Mr. Mann's initial point of contact with the PTO shaft was the uncovered end of the shaft; and that Mr. Mann fully appreciated the risks of operating an unguarded PTO shaft, plaintiffs' counsel filed an amended complaint on June 14, 1985, naming G & G as a co-defendant in their action against Hutchinson (collectively "defendants").
 
 
 11
 On October 22, 1985, G & G answered plaintiffs' complaint. On November 14, 1985, plaintiffs noticed the deposition of several G & G officials. G & G protested the scope and location of the depositions requested by plaintiffs' counsel. To prepare for the depositions, James Hergert, G & G's Product Safety Representative, traveled from Omaha, Nebraska to Constantine, Michigan to inspect plaintiffs' auger. After the January 21, 1986 inspection, Mr. Hergert explained to plaintiffs' counsel that no part of plaintiffs' PTO shaft had been manufactured by G & G. Instead, it had been "cannibalized," or assembled from parts of several different PTO shafts. G & G's counsel requested that either Mr. Hergert be deposed in Constantine or that plaintiffs accept his sworn affidavit in lieu of a deposition. Plaintiffs' counsel demanded that Mr. Hergert be deposed in Omaha.
 
 
 12
 On January 22, 1986, plaintiffs' counsel received a letter from G & G's counsel, seeking to avoid the unnecessary expense of an Omaha deposition. In the letter, G & G's counsel outlined Mr. Hergert's anticipated testimony that the PTO shaft was not a G & G product. G & G's counsel also explained that the depositions of its witnesses would be limited to whether G & G designed, manufactured or distributed the subject PTO shaft. Finally, G & G's counsel warned that since Mr. Hergert's statements clearly established that plaintiffs' product liability action was not well grounded in fact, G & G intended to seek sanctions under Rule 11.[3]
 
 
 13
 Nevertheless, plaintiffs' counsel deposed Mr. Hergert and Wayne Eipperle, G & G Vice-President for Research and Development, in Omaha. On January 29, 1986, both Mr. Hergert and Mr. Eipperle testified that the PTO shaft had not been designed, manufactured, or distributed by G & G.
 
 
 14
 On March 10, 1986, plaintiffs' counsel moved to compel discovery beyond the limits set by G & G. On April 14, 1986, the magistrate denied plaintiffs' motion to compel discovery, limited discovery to whether G & G manufactured the PTO shaft, and warned that sanctions could be awarded against plaintiffs' counsel. The magistrate's May 12, 1986 order was affirmed by the district court on October 15, 1986.
 
 
 15
 Following additional conflict between the parties as to the scope of discovery, Hutchinson moved for a protective order on November 17, 1986. After conducting a hearing, the magistrate granted Hutchinson's motion on January 14, 1987. The magistrate concluded:
 
 
 16
 [T]he uncontradicted evidence is overwhelming that all of the PTO shafts and guards obtained by [Hutchinson] for this type of auger came from G & G Manufacturing, and that the PTO shaft attached to this particular auger (which was apparently a cannibalized PTO shaft attached by persons unknown) was not a G & G product.
 
 
 17
 J.A. at 87A (quoting Mann and Mann v. Hutchinson Division, Lear Siegler, Inc., K84-71-CA4 (W.D.Mich. Jan. 14, 1987) (protective order)).
 
 
 18
 At his deposition on February 2, 1987, Mr. Mann reiterated the statements he had given to plaintiffs' counsel. Mr. Mann indicated that if he had followed his grandfather's advice concerning the safe operation of farm machinery, he would not have been injured in the auger accident.
 
 
 19
 On February 16, 1987, this matter was submitted to mediation, pursuant to Western District of Michigan Rule 42.[4] Plaintiffs were awarded no damages against Hutchinson and $37,500 in damages against G & G. Although Hutchinson and G & G accepted the mediation awards, plaintiffs rejected them.
 
 
 20
 On April 9, 1987, the district court conducted a hearing to dispose of the motions for summary judgment which defendants' had filed on March 31, 1986. Hutchinson's motion was granted. However, because a factual dispute remained concerning the guard on plaintiffs' auger, the court denied G & G's motion for summary judgment on April 14, 1987. The court explained that plaintiffs' counsel had presented a theory that G & G had manufactured a defective guard; and that the guard, which should have been covering the PTO shaft at the time of the accident, deteriorated due to the elements. As a result, the guard failed to protect Mr. Mann when he fell upon the PTO shaft. The court then cautioned plaintiffs' counsel that if they did not prove their case, it would grant a motion for a directed verdict.
 
 
 21
 On April 24, 1987, plaintiffs' counsel filed a "Notice of Withdrawal of Mediation Rejection." G & G's counsel moved to strike plaintiffs' notice to accept the mediation award two months after the mediation decision. On June 24, 1987, the magistrate granted G & G's motion.
 
 
 22
 Plaintiffs' counsel deposed G & G's expert, William Field, a Purdue University Professor, in Lafayette, Indiana on December 4, 1987. Professor Field, who is also Chairman of the Power Take-Off Task Force of the National Safety Council, concluded that by alleging that G & G negligently designed or manufactured the subject PTO shaft and guard, plaintiffs' counsel presented a frivolous argument:
 
 
 23
 [First,] the setup of the loading equipment and the auger bin arrangement contribute[d] to a potential exposure to hazardous equipment or to equipment that has a potential for injury. Second[ ], the equipment that was being used at the time was unguarded and presented a very real risk or hazard to anybody that might be using that equipment. Third[ ], the composition of the [PTO shaft suggests that it is] manufactured by G & G when, in fact, it appears that it is not. [Fourth,] the availability of replacement shielding is easy and there is no hindrance to the plaintiff in obtaining the missing components that would have made it an appropriately safe [PTO shaft].
 
 J.A. at 652-53.[5]
 
 24
 Plaintiffs filed a motion for voluntary dismissal on December 30, 1987, less than three weeks before the January 19, 1988 trial date. Although G & G did not object to plaintiffs' motion, it did object to their request for an award of only $500 in costs. At a January 12, 1988 hearing, the district court granted plaintiffs' motion for voluntary dismissal, but reserved the issue of costs.
 
 
 25
 On April 26, 1988, the district court heard G & G's motion for imposition of costs and sanctions. After considering both parties' arguments, the court granted the Rule 11 motion for sanctions for several reasons: first, because G & G did not manufacture the subject PTO shaft, plaintiffs' counsel did not present a complaint well-grounded in fact; second, immediately after the complaint was filed, G & G's counsel consistently and correctly argued that the PTO shaft was not a G & G product; and third, even if the plastic guard was manufactured by G & G, the injury was not related to the guard because Mr. Mann's direct contact with the PTO shaft caused his injuries. On May 9, 1988, judgment for attorney fees and costs in the amount of $40,487.61 was entered in favor of G & G and against plaintiffs' counsel. J.A. at 372-73 (citing Mann and Mann v. G & G Manufacturing, Inc., K84-71-CA4 (W.D.Mich. May 9, 1988) (judgment for costs and sanctions)).
 
 
 26
 Plaintiffs' counsel filed a timely notice of appeal with this court on June 3, 1988.
 
 II.
 
 27
 Federal Rule of Civil Procedure 11, as amended effective August 1, 1983, provides in part:
 
 
 28
 Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
 
 
 29
 In Century Products, Inc. v. Sutter, 837 F.2d 247 (6th Cir.1988), we explained that in this circuit, the test for the imposition of Rule 11 sanctions is whether the individual attorney's conduct was reasonable under the circumstances. See id. at 253; INVST Financial Group, Inc. v. Chemical Nuclear Systems, 815 F.2d 391, 401-02 (6th Cir.), cert. denied, 484 U.S. 927, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987); Albright v. Upjohn Co., 788 F.2d 1217, 1221 (6th Cir.1986). "The question of whether an individual's conduct was reasonable under the circumstances is a mixed question of law and fact. In light of the district court's more intimate knowledge of the facts of these cases, this court has determined that an abuse of discretion standard of review of the district court's decision to grant Rule 11 sanctions is proper." Century Products, 837 F.2d at 253. See also Mihalik v. Pro Arts, Inc., 851 F.2d 790, 793 (6th Cir.1988).
 
 
 30
 We must grant the district court wide discretion to determine whether the conduct of plaintiffs' counsel was reasonable. The district court, however, " 'is expected to avoid using the wisdom of hindsight and should test the signor's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.' " INVST, 815 F.2d at 401 (quoting Fed.R.Civ.P. 11 Advisory Committee's Note to the 1983 Amendment).
 
 
 31
 Plaintiffs' counsel may not prevail on appeal merely by showing that they acted in good faith. See INVST, 815 F.2d at 401. Plaintiffs' counsel must show that the district court abused its discretion in finding that their conduct did not meet an objective standard of reasonableness under the circumstances. See id. See also Albright, 788 F.2d at 1221; Eavenson, Auchmuty & Greenwald v. Holtzman, 775 F.2d 535, 540 (3d Cir.1985); Westmoreland v. CBS, Inc., 770 F.2d 1168, 1177 (D.C.Cir.1985).
 
 
 32
 Although the district court did not set forth in writing the basis for imposing Rule 11 sanctions on plaintiffs' counsel, we will review the oral statements of the district court found in the record. J.A. at 696-717 (citing Mann and Mann v. G & G Manufacturing, Inc., K84-71-CA4 (W.D.Mich. Apr. 26, 1988) (motion for imposition of costs and sanctions)). Accord INVST, 815 F.2d at 401 n. 4 ("Rule 11 does not require written findings of fact and conclusions of law but the presence of such a statement in the record facilitates appellate review."); Rodgers v. Lincoln Towing Service, Inc., 771 F.2d 194, 205-06 (7th Cir.1985) (upholding an award of Rule 11 sanctions even though no formal hearing was held to examine plaintiff's factually deficient complaint). The district court is entitled to deference; therefore, we will limit our inquiry to whether the district court abused its discretion in imposing Rule 11 sanctions on plaintiffs' counsel. See Mihalik, 851 F.2d at 793 (concluding that in Rule 11 cases, appellate courts should apply an appropriately deferential standard of review); Stevens v. Lawyers Mutual Liability Insurance Co., 789 F.2d 1056, 1060 (4th Cir.1986) ("[A] district court's imposition of Rule 11 sanctions is ordinarily entitled to deference by this Court and may not be disturbed except for abuse of discretion.").
 
 A.
 
 33
 On appeal, plaintiffs' counsel argues that the district court abused its discretion in determining that the amended complaint filed against G & G was not well-grounded in fact. We disagree with the argument advanced by plaintiffs' counsel and find no abuse of discretion.
 
 
 34
 Under Rule 11, sanctions may be imposed if a reasonable inquiry would have disclosed that the pleading, motion or other paper was not well-grounded in fact. See Westmoreland v. CBS, Inc., 770 F.2d 1168, 1174 (D.C.Cir.1985). As soon as the complaint is filed, Rule 11 applies to the conduct of plaintiffs' counsel. After the complaint is filed, plaintiffs' counsel retain a continuing responsibility to review their pleadings and, if necessary, to modify them to conform with Rule 11. "Failure to do so permits the district court, within its discretion, to impose sanctions against the offending litigant or attorney when a reasonable inquiry would have disclosed that the complaint was either lacking in factual support or unwarranted by existing law." Herron v. Jupiter Transportation Co., 858 F.2d 332, 336 (6th Cir.1988).
 
 
 35
 In the amended complaint, plaintiffs' counsel argued that the auger contained a PTO shaft designed and manufactured by G & G and that the allegedly defective PTO shaft caused Mr. Mann's accident. At the sanctions hearing, the district court explained that this initial theory lacked factual support.
 
 
 36
 Prior to filing the amended complaint, plaintiffs' counsel deposed Mr. Beninga, who explained that Hutchinson usually supplies augers with PTO shafts and guards produced by G & G. Mr. Beninga, however, subsequently offered several cogent arguments supporting his conclusion that plaintiffs' auger did not contain a PTO shaft produced by G & G. After plaintiffs' counsel filed their amended complaint against G & G, Mr. Beninga's testimony that the subject PTO shaft was not a G & G product was corroborated by Professor Field, Mr. Hergert and Mr. Eipperle. They agreed that plaintiffs' previously owned auger contained a PTO shaft which was constructed from parts designed by several different manufacturers. Because this evidence was available to plaintiffs' before they filed the amended complaint, plaintiffs' counsel knew or should have known that the PTO shaft was not designed and manufactured by G & G. A reasonable inquiry would have revealed that the first theory in plaintiffs' amended complaint against G & G was not well-grounded in fact.
 
 
 37
 Plaintiffs' counsel similarly argued that the auger contained a plastic guard designed and manufactured by G & G and that the allegedly defective plastic guard caused Mr. Mann's accident and injuries. At the sanctions hearing, the amended complaint's second liability theory was also rejected by the district court.
 
 
 38
 As part of their initial investigation prior to bringing this lawsuit, plaintiffs' counsel deposed Denny Mann and Mr. Stutzman. Both men testified that at the time of Mr. Mann's accident, plaintiffs' auger did not have a complete plastic guard covering the PTO shaft. Moreover, plaintiffs' counsel deposed Mr. Mann, who admitted that before the accident, he recognized and appreciated the danger of operating his auger with an effectively unguarded PTO shaft, but used his auger despite that knowledge. In addition, plaintiffs' counsel were informed by Chief Brewer that Mr. Mann's clothing originally became entangled on a sharp projection of the PTO shaft several inches away from the partial guard. After plaintiffs' counsel filed the amended complaint, Professor Field and Mr. Gumz, both G & G expert witnesses, testified that a PTO shaft with a partial guard is considered unguarded because the guards are designed for use in a complete system. Since plastic guards have a limited life, farm equipment manufacturers, including G & G, customarily sell replacement guards. Professor Field and Mr. Gumz concluded, however, that Mr. Mann's accident was caused, in large part, by his failure to purchase a complete replacement guard system for his auger.
 
 
 39
 A reasonable pre-filing inquiry would have revealed these facts to plaintiffs' counsel. Plaintiffs' counsel knew or should have known: first, that at the time of the accident, a complete plastic guard produced by G & G was not attached to plaintiffs' auger; and second, that the accident was not caused by an allegedly defective plastic guard produced by G & G. Because a reasonable inquiry would have disclosed that plaintiffs' amended complaint was not well-grounded in fact, the district court did not abuse its discretion by imposing Rule 11 sanctions on plaintiffs' counsel.[6]
 
 B.
 
 40
 Plaintiffs' counsel also contends that the district court abused its discretion by granting G & G's Rule 11 motion for sanctions after denying G & G's Rule 56 motion for summary judgment.[7] G & G responds that a denial of a motion for summary judgment does not preclude a grant of a motion for sanctions against the prevailing party. We agree.
 
 
 41
 Before considering the merits of the contention advanced by plaintiffs' counsel, we must review the two distinct approaches employed by district courts in the disposition of Rule 56 and Rule 11 motions. Although the litigation schedule rests within the discretion of the district court, the Rule 56 motion is often granted or denied shortly after it is made. See Donaldson v. Clark, 819 F.2d 1551, 1554 (11th Cir.1987). In comparison, the Rule 11 motion is generally determined at the end of the proceedings. See id. at 1555 (citing Fed.R.Civ.P. 11 Advisory Committee's Note to the 1983 Amendment). When considering a Rule 56 motion for summary judgment, the district court views the evidence in the light most favorable to the non-moving party. See, e.g., Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The district court does not weigh the evidence to "determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In contrast, when evaluating a Rule 11 motion for sanctions, the district court "measure[s]" the conduct of the non-moving party's counsel "by an objective standard of reasonableness under the circumstances." INVST, 815 F.2d at 401. The district court then weighs the evidence to determine if counsel's pleadings, motions or papers are well-grounded in fact or warranted by existing law. See Westmoreland, 770 F.2d at 1174. Given the significant differences between these two approaches, it is not surprising that a district court's ruling on a Rule 56 motion for summary judgment need not determine the outcome of the district court's ruling on a Rule 11 motion for sanctions. See Kamen v. American Telephone & Telegraph Co., 791 F.2d 1006, 1014 (2nd Cir.1986).
 
 
 42
 In the present case, we need not determine the propriety of the district court's denial of G & G's motion for summary judgment. We need only determine whether the district court abused its discretion by imposing sanctions upon plaintiffs' counsel. When the district court denied G & G's summary judgment motion, it merely indicated that there was sufficient evidence to suggest that G & G manufactured the incomplete plastic guard on plaintiffs' auger. See Anderson, 477 U.S. at 249, 106 S.Ct. at 2510 (explaining that a district court may grant or deny summary judgment without making conclusive findings of fact). The district court did not weigh the evidence to determine if plaintiffs' theory--that the allegedly defective G & G plastic guard caused Mr. Mann's accident--was well-grounded in fact. See Westmoreland, 770 F.2d at 1174. The district court concluded that if plaintiffs' counsel failed to prove their theory, then the court would issue a directed verdict.
 
 
 43
 In ruling on G & G's summary judgment motion, the district court did not determine whether the plaintiffs' theory of causation was the truth or mere speculation formulated without reference to the facts; the record evidence; or the testimony of Mr. Mann, Denny Mann, Mr. Stutzman, or Professor Field. Compare Whittington v. Ohio River Co., 115 F.R.D. 201, 206 (E.D.Ky.1987) (imposing Rule 11 sanctions upon plaintiff's counsel who named "all of the manufacturers of a certain kind of drug, when a reasonable inquiry would have disclosed that the plaintiff only took the products of a few members of the industry").
 
 
 44
 Since the initiation of this lawsuit against G & G, plaintiffs' case has been too theoretical and speculative to avoid a Rule 11 motion. Because the theories of causation advanced in plaintiffs' amended complaint and subsequent pleadings were not well-grounded in fact, the district court did not abuse its discretion by imposing sanctions upon plaintiffs' counsel.
 
 C.
 
 45
 Plaintiffs' counsel maintains that the district court abused its discretion by imposing Rule 11 sanctions not only upon the individual attorneys who signed the amended complaint and subsequent pleadings filed against G & G, but also upon the law firms of those individual attorneys. G & G counters by arguing that Rule 11 sanctions may be imposed "on both the individual attorney and the law firm on whose behalf he signed the papers." Calloway v. Marvel Entertainment Group, 650 F.Supp. 684, 687 (S.D.N.Y.1986), aff'd, 854 F.2d 1452 (2nd Cir.1988). Because Calloway was reversed by the Supreme Court's decision in Pavelic & LeFlore v. Marvel Entertainment Group, --- U.S. ----, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), we cannot accept the argument advanced by G & G.[8]
 
 
 46
 In Pavelic & LeFlore, the Supreme Court reviewed an essential Rule 11 provision, which provides: "If a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose upon the person who signed it ... an appropriate sanction...." See Pavelic & LeFlore, 110 S.Ct. at 457 (quoting Fed.R.Civ.P. 11). Upon consideration of this provision, the Court held that Rule 11 authorizes a district court to impose sanctions against the individual attorney who signed the offensive court paper, but not against that attorney's law firm. The Court found that the Rule 11 phrase "person who signed" clearly refers to an individual attorney, and not to a law partnership. See id. at 458-59. Because the text of the rule establishes a nondelegable duty to file factually and legally responsible court papers, the Court explained, "one may reasonably expect [Rule 11] to authorize punishment only of the party upon whom the duty is placed." Id. at 459. The Court concluded that the underlying purpose of Rule 11 is better served by imposing sanctions only against individual attorneys:
 
 
 47
 [T]he purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility. [This purpose is] better served by a provision which makes clear that, just as the court expects the signer personally--and not some nameless person within his law firm--to validate the truth and legal reasonableness of the papers filed, so also it will visit upon him personally--and not his law firm--its retribution for failing in that responsibility.
 
 
 48
 Id. at 460.
 
 
 49
 After considering the Supreme Court's opinion in Pavelic & LeFlore and its explicit mandate to impose sanctions only upon the individual attorney who violates Rule 11, we cannot approve of the district court's judgment imposing sanctions in the amount of $40,487.61 against Attorneys James Thomas Sloan, Jr., Fredrick J. Farrer, and Gary C. Newton, and the current or former law firms of Sloan, Benefiel, Farrer, Newton & Glista, and Solan, Newton & Stevens, jointly and severally.
 
 
 50
 Accordingly, we AFFIRM the judgment of the district court insofar as it imposes Rule 11 sanctions against James Thomas Sloan, Jr., Fredrick J. Farrer, and Gary C. Newton, as individual attorneys. In addition, we REVERSE the judgment of the district court insofar as it imposes Rule 11 sanctions against the current or former law firms of Sloan, Benefiel, Farrer, Newton & Glista, and Sloan, Newton & Stevens, or any attorneys jointly and severally. This case is REMANDED for a recalculation of the amount of the Rule 11 sanctions to be imposed upon each individual attorney[9] and for further proceedings consistent with this opinion.
 
 
 51
 JONES, Circuit Judge, concurring.
 
 
 52
 As a court inferior to the Supreme Court, we are bound to follow its directions. Thus, I concur in the majority opinion. In concurring, I must nevertheless record my profound disagreement with the Supreme Court's holding that mandates the result we reach today. It seems to me that, in the least, in an appropriate case, there should be an opportunity accorded to one who signs a pleading to offer proof of the circumstances of the signing.
 
 
 53
 My hope is that in the fullness of time the reality of the law firm culture, in which many lawyers move and have their being, will become more apparent to the Supreme Court majority than is indicated by its holding in Pavelic & LeFlore v. Marvel Entertainment Group.
 
 
 
 [1]
 As part of a preliminary investigation, plaintiffs' counsel took statements from these individuals before a complaint was filed
 
 
 [2]
 Plaintiffs' counsel later took statements from two agricultural engineering experts, Dr. Lee R. Nylander and Dr. Wesley Buchele, who corroborated Dr. Trojan's statements
 
 
 [3]
 With letters dated January 2, 1987, March 11, 1987, and December 22, 1987, G & G's counsel notified plaintiffs' counsel of G & G's intention to seek Rule 11 sanctions
 
 
 [4]
 W.D.Mich. Rule 42 provides for payment of actual costs if a party rejecting mediation does not obtain a more favorable verdict at trial
 
 
 [5]
 Professor Field's statements were corroborated by the deposition of another G & G expert, Dale Gumz, a forensic and safety engineer
 
 
 [6]
 Plaintiffs' counsel also argues, on appeal, that the district court abused its discretion by not specifying which pleadings or papers violated Rule 11. We find this argument unpersuasive
 At the sanctions hearing on April 26, 1988, the district court explained that a "factual predicate to show the involvement of G & G" in Mr. Mann's accident has never existed. J.A. at 712. In its May 9, 1988 order, the district court stated that Rule 11 "was violated by each attorney who signed any pleading or appeared at any proceeding on behalf of plaintiffs." J.A. at 372 (emphasis added).
 We find no abuse of discretion in the district court's conclusion that Rule 11 was violated by plaintiffs' amended complaint initially filed against G & G and all subsequent pleadings filed against G & G. A reasonable pre-filing inquiry should have persuaded plaintiffs' counsel that the amended complaint against G & G was not well-grounded in fact. Rule 11 was then continuously violated by the equally unreasonable, but later-filed pleadings of plaintiffs' counsel. Cf. Herron v. Jupiter Transportation Co., 858 F.2d 332, 335-36 (6th Cir.1988) ("[P]laintiff is impressed with a continuing responsibility to review and re-evaluate his pleadings and where appropriate modify them to conform to Rule 11.").
 
 
 [7]
 Federal Rule of Civil Procedure 56(c) provides that summary judgment in favor of the moving party shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."
 
 
 [8]
 In the present case, the district court imposed Rule 11 sanctions against plaintiffs' counsel, including both the individual attorneys and their law firms, on May 9, 1989. At that time, the circuit courts were in conflict concerning whether sanctions would be imposed against individual attorneys and/or their law firms. Compare Calloway v. Marvel Entertainment Group, 854 F.2d 1452, 1457 (2nd Cir.1988) (concluding that "Rule 11 sanctions should generally be imposed on a signer's law firm as well as on the individual signing an offending paper") with Robinson v. National Cash Register Co., 808 F.2d 1119, 1128-30 (5th Cir.1987) (holding that Rule 11 authorizes sanctions only against the individual lawyer or lawyers who sign court papers). To resolve the conflict, the Supreme Court granted certiorari in Calloway. See 854 F.2d 1452 (2nd Cir.1988), cert. granted, --- U.S. ----, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989)
 
 
 [9]
 In Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor, 875 F.2d 1224 (6th Cir.1989), we explained:
 [B]ecause deterrence, not compensation, is the principal goal of Rule 11, courts should impose the least severe sanction that is likely to deter ... When a fraction of the actual and reasonable fees requested is sufficient to deter future violations, it is not an abuse of discretion to award such a lesser amount. Failure to consider ability to pay is, however, an abuse of discretion.
 Id. at 1229-30 (citations omitted).
 Given the teachings of Jackson and our reversal of the district court's imposition of Rule 11 sanctions against those law firms named in the present case, we have concluded that a recalculation of the amount of the sanctions to be imposed against the individual attorneys is warranted. Since law firms generally have more funds than individual signing attorneys, economic deterrence may be visited upon the individual attorneys through Rule 11 sanctions of a lesser amount. See Pavelic & LeFlore, 110 S.Ct. at 460 (explaining that there is greater economic deterrence when the individual attorney knows that he will be solely liable.) See also INVST, 815 F.2d at 404 (suggesting that to serve the deterrence goal of Rule 11, it may not be necessary to impose sanctions in an amount equal to the actual attorneys fees and costs of the prevailing party).